[No. A090680. First Dist., Div. Four. Oct. 9, 2001.]

MICHELLE BIRSCHTEIN, Plaintiff and Appellant, v.
NEW UNITED MOTOR MANUFACTURING, INC., Defendant and
Respondent.

**COUNSEL**

Law Office of Stephen M. Fuerch, Stephen M. Fuerch; Law Office of Bryce C. Anderson and Bryce C. Anderson for Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Paul W. Cane, Jr., Rosemary M. Kirbach and Heather A. Morgan for Defendant and Respondent.

**OPINION**

**KAY, J.**—Can *staring* at a fellow employee—"to gaze fixedly . . . with eyes wide open," is how the Oxford English Dictionary defines the word—

constitute actionable sexual harassment under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA)? We hold that under the circumstances disclosed by the record in this case, such conduct may indeed violate FEHA's proscription on gender-based harassment in the workplace. Whether it does or does not amount to harassment *as a matter of fact* is a determination for the trier of fact in later proceedings; here, we decide only that the superior court erred when it granted the employer's motion for summary judgment on the ground an employee's conduct in staring at plaintiff at her workstation on an automotive assembly line was not actionable as a matter of law.

We also conclude the record presents a triable issue of material fact with respect to plaintiff's contention that her claims of sexual harassment occurring *outside* FEHA's one-year limitations statute were not time-barred. Because these out-of-time acts were part of a connected and related series of harassing and retaliatory events, plaintiff argues, the continuing violation doctrine enables her to maintain suit on them, as well as on those claims falling *within* the limitations period. We agree the showing made in opposition to defendant's motion for summary judgment was sufficient to raise a triable issue of fact whether the continuing violation doctrine tolled the limitations period with respect to these claims. In light of these determinations, we reverse the judgment of the trial court and remand the cause for further proceedings.

FACTUAL BACKGROUND

Beginning in October of 1992, plaintiff Michelle Birschtein worked on an assembly line at defendant's automotive manufacturing plant in Fremont, California. Her duties required her to be stationed at a fixed point on the line throughout her shift. Parts and other materials at the Fremont plant are delivered to the assembly line by motorized forklifts several times a day. One such forklift was driven by George Bonillia, a nonsupervisory employee who had worked at the Fremont plant since 1987. According to plaintiff's declaration filed in opposition to defendant's motion for summary judgment, she first became aware of Bonillia in late 1995, while working on the passenger car assembly line. He asked her for a date three or four times; each time, she declined the invitation, telling Bonillia she did not want to go out with him. It was during this same time, according to plaintiff, that Bonillia approached her at her jobsite and told her he wanted to "eat her." Upset by the remark, plaintiff asked Bonilla what he meant. "I want to eat you all over," he answered. Shocked and frightened by these comments, plaintiff testified she yelled at Bonillia to leave. He continued to sit on his

forklift for a while before departing. Two or three days after this incident, plaintiff testified at her deposition, Bonillia again approached her at the work site and told her he was having fantasies about her. These he went on to describe to plaintiff as putting her in a bathtub surrounded by candles and bathing her. "As he described his fantasy to me," plaintiff's declaration continued, "he would take me out of the tub, dry me off and carry me to his room with a bed covered with rose petals." Upset by these remarks, plaintiff again yelled at Bonillia to leave her alone. He did not respond and continued to sit on his forklift for "about a minute" before driving off, according to plaintiff's testimony. During this same period, plaintiff testified, she "would go outside at breaks and lunchtime, and I was told by many people that [Bonillia] was driving around looking for me."

Fearful after these incidents, plaintiff began to carry Mace to work. She also complained about Bonillia's conduct to her foreman or "group leader," Pete DeSantos. DeSantos, in turn, spoke to Bonillia's group leader about the incidents. Following plaintiff's complaint to management, Bonillia stopped speaking to her. Indeed, plaintiff admitted at her deposition that, after she complained about his conduct, Bonillia never spoke to her again. Instead, according to plaintiff's declaration, he began a campaign of staring at her. Over the course of the first six months of 1997, Bonillia would drive to plaintiff's workstation five or more times a day, making parts deliveries. Invariably, according to plaintiff, he would stare directly at her "for at least several seconds" each time. At her deposition, plaintiff described what she meant by Bonillia's "staring": "He would drive by very slowly, at first, and just stare the whole time he was going by. And I work in a very large, open area. He started to sit behind—half—his forklift halfway behind one of the pillars and just sit there, five to ten minutes at a time, just staring at me." According to her deposition testimony, this sort of conduct would occur "at least five to ten times a day." In response, plaintiff testified, she would "give him dirty looks and wave at him to go away," but "he would not change what he was doing at all."

In April of 1997, plaintiff went to an assistant manager of the Fremont plant to complain about Bonillia's staring. It was apparently as a result of this brief meeting that plaintiff later met with personnel from defendant's labor relations department and a union representative. Following these complaints to management, Bonillia's staring lessened somewhat, according to plaintiff. The staring incidents went down to "two, three times a day." Bonillia's stares during this period lasted "at least probably five to ten seconds," plaintiff testified. And Bonillia would no longer stop his forklift, driving past plaintiff's workstation instead. Describing Bonillia's staring

during this postcomplaint period, plaintiff said he "seemed to be a bit upset[.] [¶] . . . [¶] He didn't have the exact same look on his face that he did before I turned him in[.] [¶] . . . [¶] He had more—I don't know—just a little more of an upset-type look[.] [¶] . . . [¶] His eyes, I don't believe, were open as they were before." And, as far as she could remember, there was nothing sexually suggestive about the way Bonillia looked at her during the first six months of 1997. At one point during the early months of 1997, however, Bonillia drove past her workstation with one hand placed on his crotch (in plaintiff's account of this incident, he "grabbed his genitals while riding his forklift slowly by my work station and staring directly at me"). Asked how she knew Bonillia was "grabbing" himself, plaintiff testified that "his hand was not just resting . . . I would say [it was] more cupped." Of this period—from approximately January to June of 1997—plaintiff testified Bonillia never looked at her in a "sexually suggestive manner"; the only time she saw him make a gesture was when he had his hand on his crotch.

Defendant, which has a written policy barring sexual harassment,[1] investigated plaintiff's complaints regarding Bonillia's staring in 1997 and again in 1999, interviewing several witnesses each time. It did not, however, take disciplinary or corrective action against Bonillia because, as the investigator put it, "I didn't feel that [Bonillia's] actions warranted it."

## ANALYSIS

We review an award of summary judgment under the same standard applied by the trial court—de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [26 Cal.4th 80a, 107 Cal.Rptr.2d 841, 24 P.3d 493]; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) In addition, our account of the facts is presented in the light most favorable to the nonmoving party below, in this case plaintiff, and assumes that, for purposes of our analysis, her version of all disputed facts is the correct one. (*Saelzler, supra,* 25 Cal.4th at p. 768; *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) In a minute order filed December 8, 1999, the trial court granted defendant's motion for summary judgment on the ground that "as to the claim of hostile work environment/sexual harassment . . . plaintiff has failed to raise a triable issue of material fact that Bonillia's alleged conduct constituted actionable harassment, or that Bonillia's alleged conduct was 'severe or pervasive' harassment based on plaintiff's sex . . . ." In addition, the trial

[1]The policy gives as an example of sexually harassing visual conduct "leering or staring, such as stopping work to watch others go by; excessive looking at someone's private body parts; whistling or making catcalls."

court ruled, "plaintiff failed to raise a triable issue of fact that [defendant's] responses to plaintiff's complaints were legally deficient." Finally, as to the claim for retaliation, the trial court's order stated plaintiff failed "to raise a triable issue . . . that an adverse employment action followed her complaints regarding Bonillia . . . ." We consider these grounds in that order.

1. *Were plaintiff's claims of sexual harassment and retaliation actionable on this factual record, thus precluding summary judgment for defendant?*

 Defendant argued successfully below, and renews the same contentions here, that Bonillia's conduct did not amount to actionable sexual harassment or retaliation for two related reasons. First, the alleged conduct falling within the applicable limitations period was not actionable because it was not based on plaintiff's gender; that is, was not "harassment . . . based on sex." Second and relatedly, Bonillia's conduct was neither "severe" nor "pervasive," characteristics required for such conduct to be actionable. (See, e.g., *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608 [262 Cal.Rptr. 842]; *Meritor Savings Bank v. Vinson* (1986) 477 U.S. 57 [106 S.Ct. 2399, 91 L.Ed.2d 49].) Last, defendant argues it cannot be held liable as a matter of law because its response to plaintiff's complaints about Bonillia's conduct was both calibrated and proportionate to the offense, given its determination that Bonillia violated neither the law nor defendant's policies barring sexual harassment.

 Although the jurisprudence of sexual harassment is evolving rapidly, a handful of underlying principles are so well established as to be commonplace. Courts have recognized two forms of sex-based workplace harassment, quid pro quo and hostile or abusive environment. (See *Meritor Savings Bank v. Vinson, supra,* 477 U.S. 57.) The former consists, as the Latin phrase signifies, of unwelcome demands for sexual favors in return for advancement or other perquisites in the workplace. Sex-based hostile or abusive environmental claims, on the other hand, arise when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe *or* pervasive to alter the conditions of the victim's employment' . . . ." to quote from a leading decision construing title VII of the federal Civil Rights Act of 1964.[2] (*Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 [114 S.Ct. 367, 370, 126 L.Ed.2d 295], italics added.)

---

[2] " 'Because the antidiscrimination objectives and relevant wording of title VII of the Civil Rights Act of 1964 . . . are similar to those of the FEHA, California courts often look to federal decisions interpreting these statutes for assistance in interpreting the FEHA.' " (*Reno v. Baird* (1998) 18 Cal.4th 640, 647 [76 Cal.Rptr.2d 499, 957 P.2d 1333].)

We agree with plaintiff the legal question posed by the factual record in this hostile environment sexual harassment case has been asked and answered by the Second Appellate District's Division Six in *Accardi v. Superior Court* (1993) 17 Cal.App.4th 341 [21 Cal.Rptr.2d 292] (*Accardi*). The issue there was whether a female former police officer who alleged she had been constructively discharged by a series of unfair and burdensome work assignments by her employer and related harassment by her male colleagues (e.g., denying her assistance when requested, excluding her from group activities) stated a claim for relief under the sexual harassment provisions of the FEHA. (*Id.* at p. 346.) The trial court sustained defendants' demurrer to the complaint without leave to amend on the ground plaintiff's allegations failed to state an actionable claim of *sex*-based harassment. In an opinion that begins with the statement "[s]exual harassment does not necessarily involve sexual conduct," the Court of Appeal reversed. (*Id.* at pp. 345-346.)

The *Accardi* opinion drew on several federal circuit decisions to support its conclusion that "sexual harassment of the second type, the creation of a hostile work environment, need not have anything to do with sexual advances. [Citations.] It shows itself in the form of intimidation and hostility for the purpose of interfering with an individual's work performance. [Citations.] To plead a cause of action for this type of sexual harassment, it is 'only necessary to show that gender is a substantial factor in the discrimination and that if the plaintiff "had been a man she would not have been treated in the same manner."' [Citation.]" (*Accardi, supra,* 17 Cal.App.4th at p. 348.) We regard this analysis as both intuitively and legally sound and, in company with several other courts, adopt it as our own. (See, e.g., *Andrews v. City of Philadelphia* (3d Cir. 1990) 895 F.2d 1469, 1485 ["To constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones . . . ."]; *McKinney v. Dole* (D.C. Cir. 1985) 765 F.2d 1129, 1138 ["We have never held that sexual harassment . . . that occurs because of the sex of the employee must . . . take the form of sexual advances or of other incidents with clearly sexual overtones."]; *Hall v. Gus Const. Co., Inc.* (8th Cir. 1988) 842 F.2d 1010, 1014 ["Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances."].)

Nor can we agree that, particularly in view of Bonillia's prior conduct, repeated acts of *staring* at a fellow worker cannot qualify as actionable sexual harassment as a matter of law, as the trial court may have concluded and as defendant appears to argue here. Though we have found no California precedent squarely on point, more than one federal court has ruled to the contrary. In *Hirase-Doi v. U.S. West Communications, Inc.* (10th Cir. 1995)

61 F.3d 777, for example, a hostile environment case, the plaintiff alleged that Coleman, a male fellow employee, had engaged in sexually offensive behavior toward her and several female colleagues over several months. Much as defendant does here, the employer there argued that many of the plaintiff's complaints "involved only *threatening stares*—not sexual harassment." (*Id.* at p. 784, fn. 3, italics added.) Rejecting the contention that threatening stares could not constitute actionable sexual harassment, the Tenth Circuit Court of Appeals wrote that "we have previously adopted a standard that 'any harassment or other unequal treatment of an employee . . . that would not occur *but for the sex* of the employee may, if sufficiently . . . pervasive, comprise an illegal condition of employment under Title VII.' [Citation.] We believe that Coleman's alleged *threatening stares* . . . in apparent *retaliation for* the *complaints* about his sexual harassment, were sufficiently related to the prior alleged sexual harassment that they could be found to constitute continuing sexual harassment . . . ." (*Ibid.*, italics added; see also *Henderson v. Whirlpool Corp.* (N.D.Okla. 1998) 17 F.Supp.2d 1238, 1243 [" 'threatening stares' taken as a result of complaints about sexual harassment can also constitute illegal sexual harassment, if the stares are 'sufficiently related' to prior sexual harassment"].)

These precedents are in point here. What began as Bonillia's overt acts of sexual harassment (asking for dates, the "eat you" remarks, his specifically sexual bathing fantasies) were later transmuted by plaintiff's reaction (her complaints to management about the offensive conduct) into an allegedly daily series of *retaliatory* acts—the prolonged campaign of staring at plaintiff—acts that were directly related to, indeed assertedly *grew out of*, the antecedent unlawful harassment. The *Accardi* opinion put the matter convincingly when it characterized such a skein of harassment and complaint followed by retaliatory acts as a "continuous manifestation of a *sex-based animus*." (*Accardi, supra,* 17 Cal.App.4th at p. 351, italics added.) Nothing more is required to state a claim for relief under the statute. (*Meritor Savings Bank v. Vinson, supra,* 477 U.S. at p. 67 [106 S.Ct. at p. 2405] ["For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' "].) In short, like the courts in the federal precedents cited above, we conclude plaintiff's opposition to defendant's motion for summary judgment was sufficient to raise a triable issue of material fact, i.e., whether Bonillia's apparent retaliatory acts were sufficiently allied with the prior acts of harassment to constitute a continuing course of unlawful conduct. (Cf. *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798 [111 Cal.Rptr.2d 87, 29 P.3d 175] (*Richards*).)

*2. Does the continuing violation doctrine preserve plaintiff's otherwise time-barred claims of sexual harassment?*

Under this heading, we consider plaintiff's contention that her claims against her employer stemming from Bonillia's conduct occurring *prior* to May 23, 1996—a year before the date the administrative complaint was filed—are not barred by FEHA's one-year limitations statute because the continuing violation doctrine "tolled" (for want of a better word) the limitations period prescribed by Government Code section 12960.[3] This is so, plaintiff argues, because the harassing conduct occurring *within* the limitations period—i.e., repeated daily acts of staring at plaintiff as he passed her workstation—were part of an unlawful series of *related* acts originating in the fall of 1995, when Bonillia's alleged sexual harassment of plaintiff began. And because this skein of harassing acts—beginning with the request that plaintiff go out with him, through the remarks about "eating" her and his bathing fantasies, culminating in the staring episodes—constituted an ongoing, single course of conduct, plaintiff contends, the continuing violation doctrine applied to toll or suspend the running of the limitations statute with respect to the *antecedent* claims of sexual harassment.

Our resolution of this issue is made relatively straightforward by the California Supreme Court's recent decision in *Richards, supra,* 26 Cal.4th 798. There, a civil engineer, disabled by multiple sclerosis, brought suit for damages under the FEHA claiming her employer, a nationwide engineering firm, had both failed to reasonably accommodate her disability and harassed her because of it. While the acts underlying some of the plaintiff's discrimination claims fell within the one-year limitations period, others did not, predating it by as many as four years. After the plaintiff obtained a damages verdict following a jury trial, the Court of Appeal reversed, holding her out-of-time claims were not saved by the continuing violation doctrine. (26 Cal.4th at p. 811.) Granting review and reversing the Court of Appeal, the Supreme Court characterized the issue before it as whether an employer "[m]ay . . . be held liable for unlawful actions occurring outside the limitations period." "In addressing this question," the high court said, "we must determine the scope of the 'continuing violation doctrine.' That doctrine . . . allows liability for unlawful employer conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period." (*Id.* at p. 802.)

---

[3]As relevant here, the governing limitations statute—Government Code section 12960—provides that "[n]o [administrative] complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred . . . ."

Following an extended review of both California appellate and federal circuit court opinions discussing the continuing violation doctrine, the *Richards* majority borrowed a leaf from the Fifth Circuit Court of Appeals' opinion in *Berry v. Board of Sup'rs of L.S.U.* (5th Cir. 1983) 715 F.2d 971 (*Berry*), an influential decision widely followed by sister federal circuits. (*Richards, supra,* 26 Cal.4th at p. 814.) Adopting a modified version of the *Berry* test, the *Richards* majority endorsed the following formulation: "As in *Berry*, we hold that an employer's persistent failure to reasonably accommodate a disability, or to eliminate a hostile work environment targeting a disabled employee, is a continuing violation if the employer's unlawful actions are (1) sufficiently similar in kind—recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms [citation]; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence. [Citation.] But consistent with our case law and with the statutory objectives of the FEHA, we further hold that 'permanence' in the context of an ongoing process of accommodation of disability, or ongoing disability harassment, should properly be understood to mean the following: that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment would be futile." (*Id.* at p. 823.)

We acknowledge *Richards* is not factually on all fours. That case dealt with disability claims under the FEHA, while we deal with claims of sexual harassment and retaliation. Moreover, as the *Richards* opinion itself pointed out, "[t]here is particularly good reason to view the failure over time to reasonably accommodate a *disabled* employee as a single course of conduct. . . . [R]easonable accommodation is often an *ongoing process* rather than a single action." (*Richards, supra,* 26 Cal.4th at p. 821, italics added.) We cannot, however, view that distinction as decisive for analytical purposes. A close reader of the *Richards* opinion will likely agree that the foundation of the court's rationale supporting application of the continuing violation doctrine in FEHA discrimination litigation is not so much accommodation itself as a *process* of *conciliation*. The *Richards* opinion's lengthy excursion into the varieties of continuing violations—it was able to identify no less than four distinct underlying rationales (see *id.* at p. 810)—leads us to conclude that, just as claims of disability discrimination and accommodation presage an informal interactive process between aggrieved employee and the employer, so too claims of sexual harassment in the workplace are similarly amenable to informal and ongoing efforts at conciliation, adjustment, and resolution.

Perhaps more significantly, one cannot fail to be impressed with the *Richards* court's receptiveness to the continuing violation doctrine and its applicability in FEHA workplace discrimination litigation. Tracing the development of the doctrine from its inception in the early 1970's, when it rested on company-wide policies and practices, through formulations founded on notions of notice and equitable tolling, and on to the *Berry* formulation, the *Richards* opinion observed that both the Ninth Circuit Court of Appeals and, in at least one case, our Court of Appeal had abandoned any formal requisites for application of the doctrine except for a loose nexus between those acts within and those without the applicable limitations period. (*Richards, supra,* 26 Cal.4th at pp. 803, citing, among other decisions, *Bartmess v. Drewrys U.S.A., Inc.* (7th Cir. 1971) 444 F.2d 1186, 1188 [90-day limitations statute no bar "when a continuing [company] practice of discrimination is being challenged rather than a single, isolated discriminatory act"]; *Moskowitz v. Trustees of Purdue University* (7th Cir. 1993) 5 F.3d 279, 282 ["the fact that a series of discriminatory . . . acts is indeed a series, a continuum, rather than a concatenation of unrelated acts, will delay the deadline for suing with respect to the earliest acts . . . if their character was not apparent when they were committed"]; *Fielder v. UAL Corp.* (9th Cir. 2000) 218 F.3d 973, 987 [declining to adopt *Berry* formulation and stating " '[the] question . . . boils down to whether sufficient evidence supports a determination that the alleged discriminatory acts are related closely enough [to the acts outside the limitations period]' "]; and *Accardi, supra,* 17 Cal.App.4th at pp. 350-351 [allegations that police department "waged a decade-long campaign" against plaintiff were sufficient "to establish the existence of a long-standing abusive working environment"; plaintiff might be able to prove acts within limitations period "were a continuation of prior discriminatory practices"].)

The *Richards* court elected to adopt a formulation of the continuing violation doctrine lying somewhere between *Berry, supra,* 715 F.2d 971, and *Accardi, supra,* 17 Cal.App.4th 341. It did so, however, with express caveats that appear designed to ease application of the doctrine, at least in cases of workplace disability and like claims under the FEHA. We are instructed, for example, that two of the three prongs of the modified *Berry* test—the requirements of similarity and permanence—are not to be taken literally. (*Richards, supra,* 26 Cal.4th at p. 823.) Courts are to be mindful of the variety of different forms acts of harassment can take in evaluating the similarity prong of the continuing violation doctrine. As for the "permanence" leg of the modified *Berry* formulation, the *Richards* opinion makes explicit both the role and importance of conciliation efforts in the context of FEHA claims and its effect on the applicability of the continuing violation

doctrine. As the *Richards* court summed up its review of federal circuit decisions applying the doctrine, "courts . . . have tended toward a broader view of th[e] doctrine when the cause of action involves ongoing harassment or ongoing failure to accommodate disability. Even courts that have adopted the three-part *Berry* test have been inclined to find a continuing violation under these circumstances, either concluding the employer's actions had little 'permanence' or else giving little weight to the permanence factor." (*Id.* at p. 817.)

As our analysis of plaintiff's claims of actionable sexual harassment and retaliation in part one of this opinion demonstrates, beginning with a series of overtly sexual remarks in the fall of 1995, through the staring campaign continuing intermittently through 1996 and 1997, Bonillia's conduct was arguably sufficiently related and ongoing to constitute a "continuing course of unlawful conduct," and thus pass muster under the *Richards* formulation of the continuing violation doctrine. (*Richards, supra,* 26 Cal.4th at p. 800.) Assessed in light of the *Richards* instruction that the similarity prong of the modified *Berry* test be evaluated in light of the perception that "similar kinds of unlawful employer conduct, such as acts of harassment . . . may take a number of different forms," we conclude Bonillia's conduct evinced sufficient continuity to pass muster under the *Richards* standard. That conclusion, of course, means only that plaintiff presented sufficient evidence to survive defendant's motion for summary judgment; whether a properly instructed jury would conclude plaintiff's evidence was sufficient as a matter of fact to establish a continuing violation and support an award of damages outside the limitations period remains an open question.

We also hold the circumstances presented by this record satisfy the frequency prong of the *Richards* test. While it is true that Bonillia's acts of staring were intermittent and discontinuous, that appears to have been the result of plaintiff's lengthy absence from work for several months on two different occasions during which she underwent surgery to repair a damaged hand.[4] For all the record shows, apart from these hiatuses, Bonillia's conduct was continuous; it was thus sufficient to meet the frequency requirement of the *Richards* formulation, at least for summary judgment purposes. As for the third and final element of the continuing violation doctrine—"permanence"—we need not, at this juncture in the proceedings, attempt an assessment of the adequacy of defendant's response to plaintiff's complaints regarding Bonillia's conduct. The superior court will be free to evaluate this

[4]Plaintiff underwent surgery for carpal tunnel problems afflicting one of her hands and her work location was moved to accommodate her restrictions, resulting in lengthy absences from work during the latter half of 1996.

and related issues in light of the evidence as it develops at trial. (Cf. *Martin v. Nannie and The Newborns, Inc.* (10th Cir. 1993) 3 F.3d 1410, 1416.)

Last, we consider (and reject) defendant's argument that plaintiff's retaliation claim fails as a matter of law because a sine qua non of such claims is adverse action against the employee *by the employer*, rather than by a coemployee; here, defendant argues, no judicially cognizable adverse employment action was visited on plaintiff by management. We are not persuaded. Indeed, we think a pair of Ninth Circuit decisions point to the opposite conclusion. In *Fuller v. City of Oakland, Cal.* (9th Cir. 1995) 47 F.3d 1522, a sexual harassment case brought under title VII by a former police officer, the defendant city argued it was absolved of any liability because the harassment of the plaintiff had ceased, despite the fact that no disciplinary action had been taken against the offender by the city. (*Id.* at p. 1528.) Rejecting the city's position, the court of appeals wrote that "Title VII does not permit employers to stand idly by once they learn that sexual harassment has occurred. To do so amounts to a ratification of the prior harassment." (*Id.* at p. 1529; see also *Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 880-882 ["the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment"].)

It is by now familiar law that, like title VII, the FEHA should, where indicated, be construed in light of established principles of agency. (See, e.g., *Meritor Savings Bank v. Vinson, supra*, 477 U.S. at p. 72 [106 S.Ct. at p. 2408]; *Matthews v. Superior Court* (1995) 34 Cal.App.4th 598, 603-604 [40 Cal.Rptr.2d 350].) It is equally established that " 'employers are liable for failing to remedy . . . a hostile or offensive work environment of which management-level employees knew, or . . . should have known.' " (*Ellison v. Brady, supra*, 924 F.2d at p. 881.) In combination, these principles suggest a managerial failure to intervene effectively to prevent or end sexual harassment in the workplace by a fellow employee can amount to a ratification of the misconduct for which the employer may be held liable. Defendant appears to have arrived at the conclusion that Bonillia's conduct did not amount to actionable harassment as a matter of law and thus took no action against him. Having determined that conclusion was erroneous and Bonillia's conduct presented genuine issues of material fact precluding summary judgment, we think the subsidiary issue of the effectiveness of defendant's response is one that should await further proceedings in the trial court.

CONCLUSION

We are not unmindful that, like Congress in enacting title VII, the Legislature did not enact a "general civility code" when it passed the FEHA

into law. (*Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 80 [118 S.Ct. 998, 1002, 140 L.Ed.2d 201].) And we can appreciate the rhetorical effectiveness with which defendant is able to make plaintiff's allegations of Bonillia's staring, considered as discrete events, appear trivial. The staring episodes were sporadic, defendant tells us, lasted only a few seconds at a time, took place from a distance, and were never sexually suggestive. We are also cognizant of the line that divides actionably severe or pervasive harassment in the workplace from isolated offensive acts that, as an irritant of collective life, go without legal redress. The issues raised by these concerns, however, are for the trier of fact's resolution. Here, we conclude only that given the factual record before it on defendant's motion, the superior court was presented with a triable issue of material fact that precluded summary judgment.

The judgment of the superior court is reversed and the cause is remanded for further proceedings consistent with this opinion.

Appellant to recover her costs.

Sepulveda, Acting P. J., and Chiantelli, J.,* concurred.

A petition for a rehearing was denied November 7, 2001, and respondent's petition for review by the Supreme Court was denied January 16, 2002.

---

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.