[Nos. B195853, B198155. Second Dist., Div. Eight. Nov. 21, 2008.]

YOKO DOMINGUEZ, Plaintiff and Appellant, v.
WASHINGTON MUTUAL BANK et al., Defendants and Respondents.

COUNSEL

Stephen Danz & Associates, Stephen F. Danz, Ann Guleser; Law Offices of Jerry Webb and Jerry Webb for Plaintiff and Appellant.

Jackson Lewis, Mia Farber, Sherry L. Swieca and Suzanna Krkeyan for Defendant and Respondent Washington Mutual Bank.

Smith & Myers and Thomas O. Myers for Defendant and Respondent Javier Gutierrez.

## OPINION

**RUBIN, Acting P. J.**—Yoko Dominguez appeals from the separate summary judgments entered in favor of defendants Washington Mutual Bank and Javier Gutierrez in her action for job discrimination based upon her sexual orientation.[1] Because triable issues of fact exist concerning whether she timely exhausted her administrative remedies and as to the existence of discrimination, we reverse the judgments. Because Dominguez may not maintain an action for job retaliation against Gutierrez, we remand with directions to enter an order granting him summary adjudication of that claim only. We affirm, however, as to Washington Mutual's assertion that Dominguez cannot raise triable issues of fact on her punitive damages claim, and, on remand, direct the trial court to grant summary adjudication on that issue only.

### FACTS AND PROCEDURAL HISTORY

Yoko Dominguez sued Washington Mutual Bank (WaMu) and WaMu employee Javier Gutierrez for violating the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.), alleging that she had been harassed by Gutierrez and eventually fired from her job at WaMu because she was a lesbian. (Gov. Code, § 12940.)[2] Dominguez began working at WaMu in March 2002 as a temporary employee assigned to processing outgoing mail.[3] Within two weeks' time, it became known that she was a lesbian. Soon after, mail services coworker Gutierrez began making crude and offensive comments to Dominguez relating to her sexual orientation.[4] These included asking about her favorite sexual position, whether she liked giving or getting oral sex, and whether she was the "stud" with her girlfriend. Gutierrez also called her "macho," told her she needed a man, and said she would turn a female coworker into a lesbian.

Russell Rough was the direct supervisor of both Dominguez and Gutierrez. Instead of complaining to Rough about Gutierrez's conduct, sometime in late April 2002, Dominguez went to Rough's supervisor, Shelly Ferrel, who was also a lesbian. In addition to describing some of the statements Gutierrez made about her, Dominguez also told Ferrel about comments Gutierrez made

---

[1] We consolidated the two appeals for purposes of argument and decision.

[2] All further undesignated section references are to the Government Code. We will sometimes refer to WaMu and Gutierrez collectively as respondents.

[3] Dominguez obtained her WaMu job through Adecco, an employment agency for temporary workers. She submitted her timecards to, and received her paychecks from, Adecco. Although WaMu contends that Dominguez was Adecco's employee, it does not dispute that it was subject to FEHA in regard to its treatment of Dominguez.

[4] At least for purposes of their separate summary judgment motions, neither WaMu nor Gutierrez has chosen to dispute Dominguez's version of these comments.

about Ferrel, including calling Ferrel "a fucking lesbian," a "fucking macho," and saying that Ferrel thought of herself as "handsome." According to Dominguez, Ferrel promised to talk to Rough about Gutierrez's behavior.

Gutierrez then stopped making the offensive comments but began interfering with Dominguez's work by several means: throwing balls of paper that would jam up the wheels of her pallet jack; stacking heavy boxes in areas that blocked her access to various workstations; and by telling her that he had no mail to send, then later changing his mind after she had prepared all the other mail for distribution, forcing her to re-sort the mail and revise her written report about her work output. Gutierrez also began to whistle an offensive tune whenever he walked by Dominguez. According to Dominguez, the tune was widely known in Mexico as the melodic accompaniment for the Spanish phrase, "Chinga tu madre, cabron."[5] Dominguez testified that "chinga tu madre" means "go fuck your mother," while "cabron" is a term commonly used to insult men.

In May 2002, Dominguez complained again to Ferrel about Gutierrez's conduct. Although she did not mention the whistling incidents, she told Ferrel how Gutierrez was interfering with her ability to do her job. She also told Ferrel that she had overheard Gutierrez say, "Fucking lesbian asshole. I am going to fuck her." According to Dominguez, Ferrel told her it was "obvious that [Rough was] not doing his job" and promised to talk to Rough again about Gutierrez's behavior. However, Gutierrez continued to interfere with Dominguez's work and whistle the offensive tune. Between May and August 2002 Dominguez complained to Rough at least 12 times about the work interference issue, but with no effect. In fact, in July of 2002, Dominguez was assigned to work directly with Gutierrez. According to Rough, he might have given Gutierrez verbal warnings, but he never gave Gutierrez a written warning about his conduct.

According to the deposition testimony of Rough and Ferrel, Dominguez was an excellent worker with a great attitude. Sometime in August 2002, Rough asked Dominguez if she wanted to become a permanent WaMu employee and when she answered yes told her to apply for the job. She did so, but two days later, on August 23, 2002, was fired because Rough and Ferrel claimed she was frequently late for work. On August 8, 2003, Dominguez filed an administrative complaint for sexual orientation discrimination with the state Department of Fair Employment and Housing (DFEH). When the DFEH issued her a right-to-sue letter, Dominguez sued WaMu and Gutierrez. Although the complaint listed only one cause of action, it expressly

---

[5] As best we can determine from the record and the parties' briefs, the tune was the seven-note refrain commonly associated in the United States with the musical phrase, "Shave and a haircut, two bits."

included three separate FEHA violations against respondents: (1) section 12940, subdivision (a), which makes it unlawful to fire an employee due to, among others, her sexual orientation; (2) section 12940, subdivision (h), which makes it unlawful to fire an employee in retaliation for her opposition to any practices that violate FEHA; and (3) section 12940, subdivision (j)(1), which makes it unlawful to harass an employee providing services pursuant to a contract based on, among others, the employee's sexual orientation.

WaMu moved for summary judgment on three primary grounds: (1) Dominguez did not file the mandatory administrative complaint with the DFEH within one year of the last discriminatory act, meaning she failed to timely exhaust her administrative remedies (§ 12960, subd. (d)); (2) she could not show that WaMu knew or had reason to know what Gutierrez was doing; (3) Gutierrez's conduct was not bad enough to constitute unlawful harassment and discrimination; and (4) WaMu fired Dominguez for a legitimate reason based on her frequent tardiness.

The trial court granted WaMu's motion. Underlying its ruling was the finding that Gutierrez's misconduct as it related to Dominguez's sexual orientation ended sometime in May 2002 when he stopped making his offensive comments. His conduct after that time—interfering with Dominguez's work and whistling the offensive tune—was so different and unrelated in nature, the court found, that it did not extend the limitations period under the so-called continuing violation doctrine.[6] The court also found that Dominguez had no evidence to rebut WaMu's claim that it fired her for a legitimate, nondiscriminatory reason due to her tardiness.

Soon after, Gutierrez brought his own summary judgment motion on two of the same grounds: (1) Dominguez's action was barred because she did not file a DFEH complaint until August 8, 2003; and (2) his alleged misconduct was not serious enough or frequent enough to constitute actionable discrimination. The trial court agreed, finding as it had with WaMu's summary judgment motion that the harassment stopped in May 2002, and that Gutierrez's alleged actions after that time were too dissimilar to invoke the continuing violation doctrine. The court also found that Gutierrez's actions after that time were insufficient to constitute a FEHA violation.

## STANDARD OF REVIEW

Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) In reviewing an order granting summary judgment, we must assume the role

---

[6] We discuss this doctrine, *post.*

of the trial court and redetermine the merits of the motion. As such, we will strictly scrutinize the moving party's papers, but the declarations of the party opposing summary judgment will be liberally construed to determine the existence of triable issues of fact. All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. Although we must review a summary judgment motion by the same standards as the trial court, we must independently determine as a matter of law the construction and effect of the facts presented. (*Santillan v. Roman Catholic Bishop of Fresno* (2008) 163 Cal.App.4th 4, 9 [77 Cal.Rptr.3d 343].)

A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subds. (*o*)(2), (p)(2).) If the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of fact exists as to that cause of action or defense. In doing so, the plaintiff cannot rely on the mere allegations in his pleadings, "but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (*Id.*, subd. (p)(2).) A triable issue of material fact exists only if the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. (*Santillan v. Roman Catholic Bishop of Fresno, supra*, 163 Cal.App.4th at p. 9.)

## DISCUSSION

1. *Dominguez Offered Sufficient Evidence That She Timely Filed Her DFEH Administrative Complaint*

■ A prerequisite to bringing a civil action under FEHA is the filing of an administrative complaint with DFEH no later than one year after the violation occurred. (§ 12960; *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 63 [105 Cal.Rptr.2d 652] (*Morgan*).) Dominguez was fired on August 23, 2002, and filed her DFEH complaint on August 8, 2003. WaMu and Gutierrez argued, and the trial court agreed, that because Gutierrez stopped his verbal taunts no later than May 2002, well before Dominguez was fired, Dominguez's DFEH complaint was time-barred. As a result, they contend, she failed to exhaust her administrative remedy and therefore could not maintain her civil action. (*Okoli v. Lockheed Technical Operations Co.* (1995) 36 Cal.App.4th 1607, 1613 [43 Cal.Rptr.2d 57].)

■ Dominguez argued below, as she does on appeal, that her DFEH complaint was timely under an equitable exception to the one-year deadline

known as the continuing violation doctrine. (*Morgan, supra,* 88 Cal.App.4th at pp. 63–64.) Under this doctrine, a FEHA complaint is timely if discriminatory practices occurring outside the limitations period continued into that period. (*Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 349 [21 Cal.Rptr.2d 292].) A continuing violation exists if (1) the conduct occurring within the limitations period is similar in kind to the conduct that falls outside the period; (2) the conduct was reasonably frequent; and (3) it had not yet acquired a degree of permanence. (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 823 [111 Cal.Rptr.2d 87, 29 P.3d 175] (*Richards*).) Taking each requirement in turn, we conclude Dominguez raised triable issues of fact on all three.

Respondents contend that in evaluating this issue, we should not consider the "chinga tu madre" tune that Gutierrez whistled, or certain offensive remarks Gutierrez supposedly made to others that the trial court excluded as hearsay. Without reaching the validity of those contentions, we will not factor those matters into our analysis.[7] Accordingly, for purposes of our analysis, once Gutierrez stopped making his offensive remarks in or about May of 2002, all that remained was conduct that respondents characterize as nothing more than Gutierrez's failure to perform his own job properly, or as "improper mail processing." This conduct was too dissimilar from the verbal abuse that was expressly based on Dominguez's sexual orientation, and occurred too sporadically, respondents contend, to qualify as continuing violations. We disagree.

The *Richards* court suggested a flexible approach to determining similarity. The wheelchair-bound plaintiff in *Richards* suffered from multiple sclerosis and asked her employer to make certain accommodations to her condition. Over the course of several years, the employer failed to accommodate her in several ways, including persistently blocking access to hallways and a supply room; not preparing a fire escape plan; and not adjusting the timing of the elevator door to provide access to the lunchroom. Some of these occurred within the limitations period, and some occurred outside of it. In holding that all of this together amounted to a continuous course of conduct for purposes of the continuing violation doctrine, the court said that reasonable accommodation of an employee's disability is "often an ongoing process rather than a single action. As this case well illustrates, this process may have many facets and take a number of different forms. *As with harassment,* an instance of an employer's failure to accommodate that in isolation may seem trivial can assume greater significance and constitute a greater injury when viewed as

---

[7] WaMu contends that evidence of the "chinga tu madre" tune was not admissible because Dominguez never complained to Ferrel or Rough about that and because it requires expert evidence to establish the meaning of foreign language terms and phrases. The trial court sustained its objection to that evidence.

one of a series of such failures." (*Richards, supra,* 26 Cal.4th at pp. 821–822, italics added.) Citing *Fielder v. UAL Corp.* (9th Cir. 2000) 218 F.3d 973, 987–988 (*Fielder*), the *Richards* court said that "similar kinds of unlawful employer conduct, *such as acts of harassment* or failures to reasonably accommodate disability, *may take a number of different forms* . . . ." (*Richards,* at p. 823, italics added.)

The plaintiff in *Fielder* was an airline employee who, pursuant to federal antidiscrimination laws, sued United Airlines for sexual harassment and retaliation for having reported the harassment.[8] The federal district court granted summary judgment for the employer in part because it found the plaintiff filed her administrative complaint too late. The Ninth Circuit reversed, holding that a variety of different discriminatory acts that occurred both within and outside of the limitations period constituted a continuing violation. These included reprimanding the plaintiff for escorting her mother onto a flight; refusing her transfer request; refusing to give her required job assistance; and making abusive and insulting comments. The *Fielder* court said that not every incident of discrimination before the limitations period had to be of the same type, so long as there was a corresponding type of discrimination within the period. (*Fielder, supra,* 218 F.3d at p. 986.) A continuing violation could be shown by a series of related acts so long as there is sufficient evidence to show that those acts are related closely enough to constitute a continuing violation. (*Id.* at pp. 987–988.)

■ One decision cited by the *Fielder* court for this proposition was *Draper v. Coeur Rochester, Inc.* (9th Cir. 1998) 147 F.3d 1104 (*Draper*). The plaintiff in *Draper* was sexually harassed by her supervisor for several years despite repeated complaints to company management. When the frustrated plaintiff confronted her abuser about his continued harassment, he laughed snidely, picked up the phone to call a supervisor, and said the plaintiff was "digging up old bones." Because management had never before properly responded to her complaints, the plaintiff quit, then sued for sexual harassment. The defendant was granted summary judgment because the only incident that happened within the applicable limitations period was the last one, where the abuser did no more than derisively dismiss the plaintiff's complaint. The Ninth Circuit reversed, holding that the incident qualified as a continuing violation of the prior acts of abuse that took place outside the limitations period, thereby bringing within the limitations period those acts occurring outside of it. Citing *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75 [140 L.Ed.2d 201, 118 S.Ct. 998], the *Draper* court said that the harassing supervisor's seemingly isolated act had to be viewed in

---

[8] Because FEHA is considered a counterpart of the federal antidiscrimination statute (42 U.S.C. § 2000e et seq.), federal decisions construing the latter may be relied on when interpreting FEHA. (*Richards, supra,* 26 Cal.4th at p. 812.)

context with all the circumstances. "Discriminatory behavior comes in all shapes and sizes, and what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender." (*Draper*, at p. 1109.)

Because the *Draper* plaintiff described an occurrence "that can be understood only in light of the circumstances that preceded it," the Ninth Circuit held that the supervisor's "snide laughter and humiliating response to her allegations of harassment could reasonably have been perceived by her as an act of hostility that was clearly related to the authority he customarily exercised over her and to his prior, as well as his future, discriminatory treatment of her." (*Draper, supra*, 147 F.3d at p. 1109.) Combined with management's previous ineffectual responses, this suggested that management would likely take no corrective action. As a result, those events "not only constituted a final hostile act by [the plaintiff's] supervisor, but served as a sharp reminder to her of all that had already occurred and all that could be expected in the future." (*Ibid.*) Based on this, the *Draper* court held that the harasser's comments and actions at that last meeting were part of a continuing violation for purposes of the limitations period. (*Ibid.*)

Similar reasoning was applied in *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994 [112 Cal.Rptr.2d 347] (*Birschtein*), where the plaintiff employee sued for sexual harassment and the defendant employer was granted summary judgment in part based on the contention that the plaintiff's DFEH complaint was filed more than one year after the overt acts of harassment had stopped. The evidence showed that after the plaintiff complained to management that a coworker was harassing her with frequent sexual come-ons and crude remarks, the harassing employee stopped that conduct. Instead, the harasser began to pass by plaintiff's workstation several times a day, stop, and stare at her in a manner that was not sexually suggestive but which indicated that the harasser was upset. Mindful of the *Richards* court's caution that different types of acts may constitute harassment, the *Birschstein* court held the continuing violation doctrine made the plaintiff's DFEH complaint timely because the staring was sufficiently related to the overt acts of harassment that came earlier. (*Birschstein*, at pp. 1003, 1005–1006.)

With these decisions in mind, we conclude that Dominguez raised triable issues of fact that a continuing violation occurred after Gutierrez stopped his sexual-orientation-themed verbal attacks. Despite respondents' attempts to minimize Gutierrez's conduct, Dominguez's account—which we must accept as true—depicts a months-long, continual campaign to make her work life miserable. This included jamming the wheels of her pallet jack,

blocking her access to her workstations with heavy boxes, which she was forced to move, and lying to her about whether he had mail ready for her to process, then forcing her to redo her work when it turned out he in fact had mail for her. A reasonable inference arises that this was just another way for Gutierrez to harass Dominguez about her sexual orientation without expressly saying so. In fact, Dominguez told Ferrel as much when she complained about Gutierrez's new form of misconduct, telling Ferrel that "they have found other ways to do their things."

█ WaMu does not address *Birschtein*. Gutierrez attempts to distinguish that decision because the conduct that occurred within the limitations period in that case—staring at the plaintiff—also occurred outside the limitations period. According to Gutierrez, this is significant because the "same conduct" took place within and without the limitations period. We disagree. As we read *Birschtein, Richards, Fielder*, and *Draper*, they do not require that the conduct occurring within the limitations period have occurred outside the limitations period as well. Instead, they focus on whether conduct within the limitations period may be viewed as part of a continuing violation because there is evidence that the former was related to the latter. That is the case here and summary judgment on this ground was therefore improper.

Respondents also contend that no continuing violation occurred because Gutierrez's conduct was infrequent and trivial, and because it had become permanent when he stopped making offensive comments in May 2002. Dominguez testified at her deposition that Gutierrez was "constantly" blocking her access to her workstation with heavy boxes, that he jammed the wheels of her pallet jack several times from May through August of 2002 as a "campaign to make [her] life impossible at work," and interfered with her work in other ways during that period. Dominguez complained to Ferrel once about this conduct, and made a dozen such complaints to Rough. Based on this evidence, a trier of fact could find that the harassing conduct was reasonably frequent.

█ As for "permanency," it is achieved when the harassing conduct stops, when the employee resigns, or when the employee is on notice that further efforts to end the harassment will be futile. (*Richards, supra*, 26 Cal.4th at p. 823.) Respondents' permanency argument is based solely on the notion that Gutierrez's conduct achieved that status when the offensive comments stopped in May 2002, but ignores the conduct that occurred after that time. Accordingly, there were triable issues of fact on that issue as well.

### 2. *There Was Sufficient Evidence That a FEHA Violation Occurred*

█ In order to prove discrimination under FEHA, Dominguez must show, among other things, that she was subjected to conduct that was so severe and

pervasive that it created a hostile work environment. Relevant to this inquiry are the nature of the unwelcome acts; their frequency; the total number of days when the conduct occurred; and the context in which that conduct occurred. This requires the use of common sense and an appropriate sensitivity to social context to determine whether a reasonable person in the plaintiff's position would have found the conduct severely hostile or abusive. (*Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 519 [76 Cal.Rptr.2d 547].) Respondents contend Dominguez cannot raise triable issues of fact on this ground. As with their continuing violation doctrine arguments, this contention is based on respondents' characterization of Gutierrez's conduct as being sporadic, trivial, and isolated. And as with that issue, we disagree. Gutierrez's offensive remarks were certainly abusive and hostile. As discussed above, that harassing conduct was replaced by what appears to have been a daily or near daily campaign of interference with Dominguez's work that a trier of fact could find was motivated by the same discriminatory intent. On this record, we believe triable issues of fact exist concerning whether this conduct was sufficiently hostile and pervasive.

WaMu also contends there was no evidence that it was ever on notice of Gutierrez's conduct. (See *Swinton v. Potomac Corp.* (9th Cir. 2001) 270 F.3d 794, 804.) There is clear evidence to the contrary, however. Dominguez testified that after she initially told Ferrel about the offensive comments in April 2002, she told Ferrel in May 2002 that Gutierrez had found another way to harass her by interfering with her work.[9] According to Dominguez, Ferrel said she would speak to Rough about what was happening. Based on that, we infer that Ferrel told Rough that Gutierrez's harassment had now taken another form. As a result, when Dominguez complained to Rough about Gutierrez's conduct, there is evidence that Rough understood that conduct was just another form of sexual orientation discrimination. Dominguez also complained to Rough at least 12 times between May and mid-August about Gutierrez's continued abuse. Based on this, a trier of fact could determine that WaMu had notice of the harassment.

3. *There Are Triable Fact Issues That WaMu's Stated Reason for Firing Dominguez Was a Pretext*

WaMu was granted summary judgment on the alternative ground that Dominguez failed to raise a triable issue of fact that WaMu's stated legitimate reason for firing her—habitual tardiness—was a pretext. (*Morgan, supra,* 88

---

[9] The record is confused about when this meeting with Ferrel took place. Although Dominguez was asked about this at deposition in regard to a supposed August 2002 meeting with Ferrel, she is very clear elsewhere in her testimony that she met with Ferrel only twice, in April and May 2002. Under the summary judgment standard of review, we infer that Dominguez made that statement to Ferrel in May 2002.

Cal.App.4th at pp. 68–69.) The linchpin of this argument is WaMu's assertion that Dominguez's frequent tardiness was undisputed. Our independent review of the evidence shows otherwise, and we conclude that triable fact issues exist on this point.[10]

The evidence cited in WaMu's appellate brief is not as clear and undisputed as WaMu contends. Some of the evidence comes from Dominguez's deposition, where although she admits being five minutes late on July 10, 2002, she explains that changes to her scheduled start time on certain days made it appear that she had been late. The bulk of WaMu's contention, however, rests on the testimony of Rough, who said he kept track of Dominguez's lateness in a handwritten log. According to his log entries, Dominguez was late twice in May, twice in June, twice in July, and twice in August, and went missing for 25 minutes on August 13. However, according to Ferrel, the significant factor in firing Dominguez was her tardiness "right there at the end." This is confirmed by a WaMu employee status report for Dominguez, which quotes Rough as saying she was let go on August 23, 2002, because she had been late the last two days.

However, according to Dominguez, on August 21, 2002, Rough sent her to fill out an application for full-time employment with WaMu. If so, then it is reasonable to infer that any and all tardiness from before that date was unimportant to WaMu and had no bearing on the decision to fire her two days later. Furthermore, even though Dominguez admitted in her deposition that she was late a few times, she attributed that to sleeplessness caused by Gutierrez's conduct. As for the rest, between her deposition testimony and entries from her diary that were included in the record, she flatly denied being late and in fact accused Rough of lying or otherwise engineering things to make it appear as if she had been late. This clearly raises an evidentiary conflict that should have precluded the summary judgment.

Finally, WaMu contends an inference of pretext cannot arise because there was too long a time gap between Dominguez's complaint to Ferrel and the decision to fire her, and because it makes no sense to believe she was asked to apply for full-time work if she were the victim of discrimination. As our previous discussions show, there was little or no gap between Dominguez's many complaints to Rough and the decision to fire her. As for Rough having asked Dominguez to apply for full-time work, it is arguable that Rough did so

---

[10] Although some of the evidence we have relied on was not included in Dominguez's opposition separate statement of disputed fact, it was in the record before the trial court and we exercise our discretion to consider it. (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315 [125 Cal.Rptr.2d 499].)

as cover for his decision to fire her, or that he did not have all the essential facts. At most, however, it raises a factual conflict that a trier of fact must resolve.[11]

### 4. *The Punitive Damages Claim Against WaMu*

The trial court ruled that summary judgment was proper as to Dominguez's punitive damages claim against WaMu because Dominguez's underlying claims had each failed. WaMu asks us to summarily adjudicate the punitive damages claim on another ground raised below—that there was no evidence that Rough or Ferrel were its managing agents. (Code Civ. Proc., § 437c, subd. (f)(1) [summary adjudication proper as to punitive damages claims]; *California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22 [4 Cal.Rptr.3d 785] [we may affirm summary judgment on any correct legal theory raised in the trial court].) Except for a passing reference in the conclusion of her reply brief, stating without discussion, citation to the record, or citation to authority that this is an issue of fact, Dominguez has failed to address the issue. We therefore deem it waived. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 [46 Cal.Rptr.2d 119].)

### 5. *The Retaliation Claim Against Gutierrez Was Improper*

■ One aspect of Dominguez's three-part cause of action was a retaliation claim against Gutierrez. However, retaliation claims are proper against an employer only, not against individual employees. (*Jones v. The Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1160 [72 Cal.Rptr.3d 624, 177 P.3d 232].) Gutierrez still remains potentially liable for any acts of harassment actually performed by him. (§ 12940, subd. (j)(3).) Accordingly, summary adjudication of that claim was proper and we will direct entry of an order to that effect. (See *Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854–1855 [16 Cal.Rptr.2d 458] [where separate causes of action are commingled into one, court may grant summary adjudication of the individual claims].)

### DISPOSITION

For the reasons set forth above, the summary judgments entered for WaMu and Gutierrez are reversed. The matter is remanded to the superior court with directions to enter a new order granting Gutierrez summary adjudication of

---

[11] WaMu contends that discrimination was highly unlikely given that Ferrel was also a lesbian. However, Ferrel appears to have relied heavily on what Rough was telling her. Dominguez testified that Rough began treating her unfairly after learning she was a lesbian. Combined with the evidence that Rough was essentially falsifying Dominguez's tardiness, an inference arises that Rough was deceiving Ferrel about that issue.

only Dominguez's retaliation claim, and granting WaMu summary adjudication of her punitive damages claims. The orders granting summary judgment are to be denied in all other aspects. Appellant shall recover her costs on appeal.

Flier, J., and Bigelow, J., concurred.