Filed 9/8/16  Tevis v. Spare Time, Inc. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| KELLY TEVIS, | C074938 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201100116411CUWTGDS) |
| v. | |
| SPARE TIME, INC., et al., | |
| Defendants and Respondents. | |

The trial court granted summary adjudication of all 10 causes of action in plaintiff Kelly Tevis's complaint against her former employer, Spare Time, Inc. (the Company), and her supervisor, Joe Rose (Rose).  We affirm the summary adjudication of the causes of action arising from Rose's alleged sexual harassment, assault, and intentional infliction of emotional distress based on the running of the statute of limitations, fatal admissions by plaintiff, and a failure of proof of intentional tortious conduct.  We reverse, however four causes of action arising from the Company's alleged failure to engage in the interactive process in good faith, failure to provide a reasonable accommodation, retaliation, and wrongful termination because we find there remain triable issues of

1

material fact as to those causes of action. The result is that the claims alleging the more egregious conduct by plaintiff's supervisor will not be tried, whereas the Company's response to her complaints will be.

*Allegations of Sexual Harassment and Violence*

Plaintiff alleges that Rose was violent, crass, and vulgar, and used sexually inappropriate language in the workplace. There is no dispute that plaintiff had been a rising star at the Company's fitness centers before Rose was transferred to the Natomas facility in the summer of 2007. What is in dispute is what led to plaintiff's medical leave in April of 2010, how and what the parties communicated during her leave, and why she was fired in August of 2010. Because this is an appeal of a summary judgment, the facts are presented in the light most favorable to plaintiff. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1005 (*Scotch*).)

Six months after she was hired as an assistant marketing director at the Company's Lodi facility, the Company promoted plaintiff to be a marketing director at the Natomas Racquet Club. In 2006 and 2007 she was selected as the "Rookie of the Year" and "Marketing Director of the Year."

Plaintiff alleges Rose began exhibiting inappropriate behavior a few months after his arrival. By mid-2008, she claims he was sexually harassing her. Although plaintiff testified in her deposition that it was difficult to remember when the many incidents occurred, she recalled at least three before March 2009. She alleges that Rose shared stories about 1) training Muslim women and how he was "between their legs and in their chest" even though their husbands would disapprove, 2) a man blow-drying his penis in the locker room, and 3) girls wearing their bathing suit bottoms in the club. He told plaintiff that as the general manager he could waive the club rules, and he did not have a problem if they wanted to run around like that. On at least one occasion, Rose told her to "shut the fuck up."

2

On or about March 10, 2009, Rose went into a violent rage, slamming doors, screaming obscenities, and pacing the office before picking up an office chair and slamming it into the ground until it was in pieces. He left the club but later stormed into plaintiff's office and harassed her. Alone in her office, she tried to assure Rose that everything was going to be okay.

Plaintiff went home and called Dave Anderson, the president of the Company, to complain about Rose's violent outbursts and sexually inappropriate behavior. She also complained to Gavin Russo, the marketing supervisor. On March 16 Mark Tappan, the director of operations, met with plaintiff and two of her female coworkers to discuss Rose's behavior. They each recounted a few stories about Rose's behavior during the lunch meeting. They told Tappan that Rose had exhibited a pattern of violent outbursts and had thrown reams of paper across the office, hitting walls, desks, and ceiling fans, and barely missing staff members.

Plaintiff reported that Rose's behavior improved for a few months, particularly during the time period when the owner's daughter was working on-site. But after the owner's daughter went on maternity leave, Rose's behavior deteriorated once again. Plaintiff warned Russo that Rose was having problems and was "going to blow." Russo assured plaintiff he would take action, but nothing changed.

Although plaintiff could not piece together a precise chronology, she recounted a number of incidents that thereafter ensued. On one occasion, Rose "stretched out" an employee's leg after she pulled a muscle and told the employee and a coworker that the employee was "ready for a man tonight." Rose found pornography in a locker, took it home, and thought it was really funny that his wife became angry. According to plaintiff, as a female employee was bending over, Rose commented that she "should have just asked [him] for a raise."

Rose constantly touched, adjusted, and rubbed his crotch in plaintiff's presence. And he recounted endless stories about his past sexual adventures to plaintiff, including

3

the orgies that were performed for him while he played in a band, the abundance of sex he enjoyed while he was stationed in Thailand, and how on one occasion a young woman wanted to "fuck him" in the back of his truck, even after he showed her the baby car seats that would be in the way.

Plaintiff heard Rose repeatedly refer to female employees as "bitches," particularly when he was angry. At least twice, he told plaintiff to "call the bitches and tell them they better get their fuckin' asses in here." When new computer programs were being installed at the club, Rose lashed out and said he was going to "kick that little fat fuck-in [*sic*] homosexual Craig's ass." He referred to the same man as a "fucking faggot."

In addition to his sexually charged stories and profanities, Rose flew into occasional fits of rage. When plaintiff was redesigning her office, Rose became frustrated, called her a "bitch" in her absence, and hit her door. Plaintiff heard about his outburst and was afraid to return to the office that day.

In early April 2010 Rose was out of the office attending a conference. When he returned on April 12, plaintiff sent him an e-mail in which she mentioned that she was happy to have him back.

On Friday, April 16, Rose had another tirade at a team meeting during which he told plaintiff to "shut the fuck up." He was about two feet from her face as he berated her, giving her an anxiety attack. At her deposition, she testified she sat there with extreme pressure in her chest, fearful that he might strike her. On Monday morning, April 19, her doctor diagnosed her with severe depression and anxiety, and put her on a medical leave of absence. She testified that her doctor opined she would be unable to return to work as long as Rose was there. The Company insists that neither plaintiff nor her doctor ever informed anyone at the club she could not return to work for Rose. Plaintiff faxed Anna Sierra, the human resources manager, a written request for a two-and-a-half-week leave accompanied by a doctor's note.

4

*What Transpired After Plaintiff Became Unable to Work*

The following day, April 20, Rose called plaintiff at home. He had never called her at home before. He left a message stating, "call me when you can." She felt threatened, and because she had communicated the need for a medical leave with human relations, she did not return his call.

On April 21 Sierra mailed information to plaintiff regarding the Family and Medical Leave Act of 1993 (FMLA; 29 U.S.C. § 2601 et seq.) and workers' compensation. On April 26 plaintiff filled out the workers' compensation incident report wherein she described Rose's violent fits of rage, the pervasive nature of his sexual innuendos, the stress incident that led to her anxiety attack, and her inability to come to work because she did not feel safe and her health had deteriorated. She identified 12 witnesses. She believed she had submitted all that was required of her.

Nevertheless, on May 13 plaintiff sent Sierra an e-mail entitled "Formal Complaint towards Joe Rose," in which she described a pattern of "displaying signs of rage and bullying, making slurs and derogatory comments about race, sexual activities and sexual experiences." She complained that after a brief period of improvement, Rose "again started displaying and creating the same intimidating, hostile work environment." "Over the next few months Joe Rose became bolder regarding his conduct. During directors' meetings, and at other times, he slammed his fist into doors, kicked desks, used excessive profanity, bullied and intimidated to the point where I feared for my safety. Joe Rose also continued using derogatory comments regarding race, sexual orientation, and sexual activities that were offensive." In sum, "Joe Rose's consistent verbal aggression, intimidation, severe abusive and offensive actions causes a sense of dread and fear."

In reply, Sierra assured plaintiff that the Company had undertaken an investigation. While the investigation was underway, plaintiff was granted additional leaves of absence. Mark Tappan, the director of operations who had met with plaintiff

5

and two other female employees in March 2009 to give them the opportunity to discuss Rose's inappropriate behavior at work, conducted the investigation on behalf of the Company. He reported that the other two employees did not observe the same deterioration in Rose's behavior and concluded that plaintiff's complaints did not have merit. He believed most of her complaints regarded behavior that had occurred a year earlier and before he met with Rose. Plaintiff alleges that Tappan did not interview her and that none of the other 10 witnesses she identified in her incident report were ever interviewed during the investigation.

On July 6 Sierra sent plaintiff a letter informing her that her leave of absence had been designated as FMLA/CFRA (California Family Rights Act; Gov. Code, § 12945.2) leave which would expire at the end of 12 weeks on July 12. On July 9 plaintiff sought clarification regarding the FMLA designation and outlined her progress with her workers' compensation claim.

But on July 7 Sierra notified plaintiff that the investigation was completed, her complaint had no merit, and she was expected to continue to report to Rose. Sierra wrote: "We expect you two to work together to achieve a cohesive and productive work environment, and we expect respectful behavior and courteous treatment by and among all Company employees." Plaintiff was instructed to keep the details of the investigation confidential, and she was warned she would incur disciplinary action if she breached the confidence. Plaintiff alleges that Rose was not put under similar restrictions. In her view, the investigation was not complete since Tappan had failed to interview the majority of the percipient witnesses. In the July 7 letter, Sierra accused plaintiff of failing to respond to company inquiries. Sierra wrote, "On multiple occasions, the Company tried to contact you (by telephone and e-mail) to discuss and obtain more information about your complaint. Unfortunately, you did not return any of those telephone calls or e-mails, nor did you otherwise contact anyone in response."

6

Plaintiff insists the Company's accusation that she did not communicate is patently untrue. In her written defense on July 13, plaintiff addressed both the phone calls and e-mails. She explained that she received four phone calls at home within the first 24 hours after her doctor put her on medical leave, while she was still trying to process what he had told her. Because she was depressed, fragile, and upset, her husband had asked the Company to give her "some space because [she] was extremely stressed." She also recapped the correspondence, including e-mails, letters, and forms, she had sent to the Company from April 19 through July 9, 2010.

"Here is the total of e-mails and faxes that I have sent you from the same time period: 10 e-mails and 4 faxes. A check in the amount of $180.00 was sent to Spare Time for my portion of the health premium for the months of May, June and July. I have also completed, signed and returned 4 forms to you: Employment Incident Report; MPN Form B; Worker's Compensation Claim Form; and Leave of Absence Request Form.

"Furthermore, I have received multiple letters and forms from Dean Nguyen, the claims agent for Republic Indemnity, Spare Time's worker's compensation insurance carrier. For example: W-2 form; Employee Wage Schedule; Cop[y] of each month's earnings statement; Forms for QME panel list; Employee's Report of Injury; miles traveled for medical treatment forms; Authorization for Release of Medical Records; and forms for Medicaid and Medicare. All of these forms have been completed, signed and returned to Republic Indemnity. I have also called the QME doctors on the panel list in order to set up a doctor's appointment with one of them, and kept in contact with Dean Nguyen.

"On top of all of this, I have stayed in contact with my doctor, Dr. Michael Lin. Per the advice of my doctor I have also been meeting with someone weekly in regards to my work situation. I have tried extremely hard to communicate on a timely basis while staying on top of emails, letters, reports, forms and Doctor Appointments."

7

On July 16 Sierra notified plaintiff that the Company had designated her initial request for leave as a leave of absence under the FMLA/CFRA, but that 12-week leave had expired on July 12. She further explained: "Because you have exhausted the maximum leave time available under FMLA/CFRA, you are not eligible for or entitled to any further FMLA/CFRA leave. You may, however, be eligible for a leave of absence as an accommodation under the California Fair Employment and Housing Act ('FEHA' [Gov. Code, § 12900 et seq.]) and/or the federal Americans with Disabilities Act ('ADA' [42 U.S.C. § 12101 et seq.]) if you are a qualified individual with a disability. As a result, the Company is treating your latest doctor's note as a request for an accommodation in the form of a leave of absence." Sierra assured plaintiff the Company was committed to "engaging in a reasonable interactive process with all employees who may be eligible for reasonable accommodations in the workplace." She enclosed a questionnaire to be completed by plaintiff's doctor and returned by plaintiff within 15 days.

Plaintiff missed the deadline. Sierra wrote to her on August 3 encouraging her to participate in the interactive process and extending her deadline to submit the questionnaire to August 11. She also offered to send the questionnaire directly to plaintiff's doctor, and she invited plaintiff to call her if she wished to ask any questions. Throughout this letter, as in her letter initiating the interactive process, she referred to an additional leave of absence as a possible accommodation.

On August 9 plaintiff e-mailed Sierra, explaining that she could not get in to see her doctor until August 23. Sierra extended the deadline until 5:00 p.m. on August 23. The Company never received the completed questionnaire. Plaintiff testified she does not know whether her doctor completed the questionnaire or if she told him about the deadline. At one point she testified it was not her responsibility to make sure the completed questionnaire was returned, but she later testified that she did not know if it was her responsibility or not.

8

Plaintiff was discharged on August 26, 2010. Sierra explained: "Based on your failure to provide any response to the questionnaire or otherwise identify what 'accommodations' you need, the Company has determined that you are not willing to engage in the interactive process. Despite that, the Company still evaluated your eligibility for an accommodation. Based on all information available, we have determined that you are not eligible for a reasonable accommodation. First of all, the Company has no information to suggest that you are suffering from any type of 'disability' within the meaning of the ADA and/or FEHA. Moreover, there is no suggestion that any type of 'reasonable accommodation' will enable you to return to work. The Company is not aware of any changes that could be made to your Marketing Director position that would enable you to perform the essential functions of that position. As for a continued leave of absence, you have already been on leave from your position for over 4 months. There is no indication – from either you or your medical provider – that you will be capable of returning to work after a reasonable extension of that leave." She concluded: "If and when you are released to return to work, please let us know. At that time, we will evaluate what openings are available and reinstate your employment, if possible."

Plaintiff admitted that she never asked the Company to separate her from Rose, to put her at a different club, or to provide any other kind of accommodation. She also admitted that Sierra was responsive to her e-mails, Sierra was staying in communication, and that they had a good "back and forth." She further admitted that she could not have gone back to work before she was terminated, even if Rose was not present, because she was still emotional, stressed, and had a lot of anxiety. Indeed, even at the time of her deposition in July of 2012, she testified she did not know whether she could work at another club because she was not sure whether she was ready mentally and emotionally.

Based on her own "gut feeling," plaintiff testified that she was fired to stop her from complaining, because "[t]hey wanted the situation with Joe Rose to go away," and

9

possibly because she had a disability. She admitted she was not terminated because she was a woman. She testified she had no evidence that the Company's reasons were pretextual.

Plaintiff filed an administrative complaint with the Department of Fair Employment and Housing (DFEH) on April 19, 2011. On December 30, 2011, she filed a civil complaint for damages, alleging 10 causes of action: 1) wrongful termination in violation of public policy, 2) failure to prevent sexual harassment, 3) sexual harassment, 4) gender discrimination in violation of the California Constitution, 5) disability discrimination, 6) failure to accommodate, 7) failure to engage in the interactive process, 8) retaliation, 9) assault, and 10) intentional infliction of emotional distress. The trial court granted defendants' motion for summary judgment. Plaintiff appeals.

## DISCUSSION

## I

### *Standard of Review*

Plaintiff attempts to focus our attention on the tentative ruling, wherein the trial court denied summary adjudication of most of the causes of action based on the existence of triable issues of material fact. Unfortunately for plaintiff, the trial court changed its mind with little explanation and granted summary judgment. We agree with defendants that the tentative ruling is not binding on the trial court and can be modified and changed (*Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 203); moreover, it carries no weight on appeal (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646-647). The mere fact that plaintiff repeats the trial court's tentative rationale as to each cause of action does not make it relevant. (*Wilshire Ins. Co. v. Tuff Boy Holding, Inc.* (2001) 86 Cal.App.4th 627, 638, fn. 9.) We review the trial court's final ruling de novo. (*Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 999 (*Birschtein*).)

It is true, however, as plaintiff urges with equal vigor, that we must liberally construe her declarations to determine the existence of triable issues of fact and draw all

10

inferences and resolve all doubts in her favor. (*Dominguez v. Washington Mutual Bank* (2008) 168 Cal.App.4th 714, 720 (*Dominguez*).) A moving defendant has the burden to demonstrate that the undisputed facts establish an affirmative defense, such as a statute of limitations, as a matter of law. (*Trovato v. Beckman Coulter, Inc.* (2011) 192 Cal.App.4th 319, 322 (*Trovato*).) " 'While resolution of the statute of limitations is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper. [Citation.]' " (*Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048, 1054-1055.)

**II**

***Plaintiff's Causes of Action for Sexual Harassment and
Failure to Prevent Sexual Harassment Were Barred by the Statute of Limitations and
Were Not Saved by the Continuing Violation Doctrine or Equitable Tolling***

Before filing a lawsuit for sexual harassment or any of its derivatives, a plaintiff must file an administrative complaint with the DFEH within one year of the date on which the harassment occurred. (Gov. Code, § 12960, subd. (d); *Trovato*, *supra*, 192 Cal.App.4th at p. 323.) The Company alleged that the last potential incident of harassment occurred on plaintiff's last day of work, April 16, 2010. Since she did not file her administrative complaint until April 19, 2011, the Company maintains that she missed the one-year deadline and consequently failed to exhaust her administrative remedy, a " 'jurisdictional prerequisite to resort to the courts.' [Citation.]" (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 70.)

Plaintiff urges us not only to give her every benefit of the doubt in determining whether a triable issue of fact exists but also to liberally construe the FEHA statute of limitations. (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 819 (*Richards*).) "In order to carry out the purpose of the FEHA to safeguard the employee's right to hold employment without experiencing discrimination, the limitations period set out in the

11

FEHA should be interpreted so as to promote the resolution of potentially meritorious claims on the merits." (*Romano v. Rockwell Internat., Inc.*, (1996) 14 Cal.4th 479, 493-494.) Plaintiff insists that the continuing violation doctrine, liberally applied, saves her lawsuit.

The continuing violation doctrine " 'allows liability for unlawful employer conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period.' [Citation.]" (*Trovato*, *supra*, 192 Cal.App.4th at pp. 325-326.) The employer's unlawful actions are "sufficiently connected" if they satisfy three criteria: 1) the unlawful conduct occurring outside the statute of limitations is "sufficiently similar in kind" to the unlawful conduct within the limitations period, 2) the unlawful actions have occurred with "reasonable frequency," and 3) they have not "acquired a degree of permanence." (*Richards*, *supra*, 26 Cal.4th at p. 823.)

In the context of a motion for summary judgment, plaintiff contends she need only raise a reasonable inference that Rose's phone call to her at home on April 20, leaving the message, "call me when you can," was a continuation of the sexual harassment she had endured for nearly two years. It is certainly true that what might appear to be an isolated act must be viewed in the context of all the circumstances. (*Dominguez*, *supra*, 168 Cal.App.4th at pp. 722-723.) "Discriminatory behavior comes in all shapes and sizes, and what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender." (*Draper v. Coeur Rochester, Inc.* (9th Cir. 1998) 147 F.3d 1104, 1109.)

There is no evidence that either the substance or the tone of the phone message was inappropriate in any way. Rose simply asked plaintiff to call him when she could. Plaintiff does not suggest otherwise. The leap she asks us to make is based on the simple facts that Rose called her at home, which he had never done before, and that the call was

12

made just a few days after Rose's outburst at the team meeting in which he angrily told her to "shut the fuck up." Plaintiff argues these circumstances give rise to a reasonable inference that the call was meant to her harass her. That is the leap we are unable to make.

To constitute a continuing violation, the unlawful act must be " 'similar in kind' " to the harassment that occurred outside the statute of limitations. (*Trovato*, *supra*, 192 Cal.App.4th at p. 326; see *id*. at p. 327.) There is simply no evidence that the phone call was similar to the profanities, sexually inappropriate references, stories, and innuendos, or to the violent outbursts, that had characterized Rose's behavior at the office. To the contrary, the message was entirely appropriate. Rose was the general manager of the club, and plaintiff, the marketing director, had just gone out on an unexpected medical leave. He might have wanted to discuss projects she had underway and to solicit her advice on how they should be handled in her absence. He might have wanted to apologize for his quick-tempered remarks at the meeting or, because they had worked closely together for an extended period of time, to check on her health and well-being. The record is silent as to his motivation. But because Rose was the general manager of the club and plaintiff's immediate supervisor, his call to her at home does not give rise to an inference that he was continuing a pattern of harassment. Indeed, the message he left was the polar opposite of his alleged abusive pattern in that he simply asked her to call him.

We must reiterate that we are acutely sensitive to the principles plaintiff advocates; that is, that we must construe the evidence in her favor and liberally construe the application of the statute of limitations to assure that meritorious claims are not forsaken prematurely. But the facts of the cases upon which plaintiff relies bear no resemblance to the innocuous phone message she received from her alleged harasser. For example, in *Birschtein*, *supra*, 92 Cal.App.4th 994, the plaintiff's coworker stopped harassing her with sexual come-ons and crude remarks following the plaintiff's complaint

13

to management, but he continued to pass by her workstation several times a day and stare at her.  The continuing violation doctrine applied, the court concluded, because the staring was sufficiently related to the overt acts of harassment that had come earlier.  (*Id*. at pp. 1003, 1005-1006.)

Birschtein states in a slightly different way what the Supreme Court articulated in *Richards*, *supra*, 26 Cal.4th 798.  The conduct must be "sufficiently related" to the conduct that preceded it, as *Birchstein* characterizes it (*Birschtein*, *supra*, 92 Cal.App.4th at pp. 1005-1006), and it must be "similar in kind" as the Supreme Court characterizes it (*Richards*, at p. 823).  Similarly, in *Dominguez,* the plaintiff's harasser constantly blocked her access to her workstation with heavy boxes and jammed the wheels of her pallet jack several times, in plaintiff's estimation, to make her life impossible at work.  (*Dominguez*, *supra*, 168 Cal.App.4th at pp. 723-724.)  In *Birschtein* and *Dominguez*, the Courts of Appeal found that the harassing conduct that occurred outside the statute of limitations was a continuation of the same type of harassing conduct that occurred within the statute, and because the conduct was similar and sufficiently related, the one-year statute of limitations for filing a FEHA complaint did not bar a subsequent civil lawsuit.

Our case is much different.  The isolated phone call was not similar in kind or substantially related to the type of harassment plaintiff's supervisor had engaged in at the office.  Whereas the plaintiffs in *Birschtein* and *Dominguez* remained at work and the harassment was ongoing, plaintiff in the case before us never returned to work and had no further contact with the alleged harasser.  We cannot say that the mere existence of the message, devoid as it was of any crude or inappropriate language, was similar or substantially related to the kind of harassment plaintiff alleged occurred at the office.  Nor are we willing to say that any contact, even for work related and totally legitimate business purposes by plaintiff's supervisor once she was on leave, constituted harassment based solely on the history of sporadic inappropriate behavior.  In other words, mere contact alone, devoid of any harassment, does not delay the running of the statute of

14

limitations. Because plaintiff did not file her FEHA complaint within one year of the last incident of alleged harassment, her administrative complaint for sexual harassment was barred and she failed to timely exhaust her administrative remedies. (*Okoli v. Lockheed Technical Operations Co.* (1995) 36 Cal.App.4th 1607, 1612-1613.)

But plaintiff contends that the cause of action for failing to prevent sexual harassment equitably tolled the statute of limitations. She relies on the internal complaint she made about the harassment and analogizes to cases in which a plaintiff pursues a formal alternative legal remedy to resolve the dispute. She cites no case, and we cannot find any, in which a plaintiff forestalled the running of the statute merely by lodging an internal complaint about harassment.

Pursuant to the doctrine of equitable tolling, "the running of a limitations period is equitably tolled when an injured person has several formal legal remedies and reasonably and in good faith pursues one." (*Jones v. Tracy School Dist.* (1980) 27 Cal.3d 99, 108.) Equitable tolling "allows a plaintiff who has a choice of legal remedies to pursue one remedy without simultaneously pursuing another remedy" and "generally requires a showing that the plaintiff is seeking an alternate remedy in an established procedural context." (*Acuna v. San Diego Gas & Electric Co.* (2013) 217 Cal.App.4th 1402, 1416.) In answer to plaintiff's argument, *Acuna* squarely holds that "[i]nformal negotiations or discussions between an employer and employee do not toll a statute of limitations under the equitable tolling doctrine." (*Id*. at p. 416.) As in *Acuna*, plaintiff does not allege any facts showing she was pursuing an alternate remedy that excused her from filing her administrative claim on time. In the absence of any authority, we reject the notion that an employee can forestall the running of the statute indefinitely by simply lodging an internal complaint with a human relations department.

15

### III

### *Plaintiff's Admissions Are Fatal to Her Causes of Action*
### *for Gender and Disability Discrimination*

To establish a prima facie claim for discrimination, plaintiff must establish that she was fired *because* of her gender or her disability. (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 235-236.) At her deposition she testified that gender was not a reason considered by the Company in terminating her. She also testified that although the Company had approved her request to extend her return-to-work date four separate times for a total of 18 weeks' leave, she remained unable to return to work. She stated that she could not have gone back to work at another club, even without Rose, prior to her termination on August 26, 2010. Even as late as July 13, 2012, two years after her termination, she testified she did not know if she could return to her position, even if separated from Rose, because she was not ready mentally or emotionally.

Plaintiff's unvarnished admission that gender was not a motivating factor in terminating her is fatal to her gender discrimination cause of action. Any later prevaricating in declarations or arguments cannot undo the damage. Since she was not fired because of her gender, she has no gender discrimination case, and mere suspicions of improper motives based on conjecture and speculation are insufficient as a matter of law to create a triable issue of fact. (*Kerr v. Rose* (1990) 216 Cal.App.3d 1551, 1563-1564, superseded by statute on other grounds as explained in *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 583.)

Plaintiff's admission that she could not return to work with or without accommodation is also fatal to her disability discrimination cause of action. An employee bears the burden of proving she is able to do the job with reasonable accommodation. (*Green v. State of California* (2007) 42 Cal.4th 254, 262.) An employer can lawfully terminate an employee who, with reasonable accommodation, is unable to perform the essential duties of the job. (Gov. Code, § 12940, subd. (a)(1).) An

16

indefinite leave of absence is not a reasonable accommodation. (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226-227.)

Plaintiff raises a number of arguments to save her disability discrimination claim. She insists she was not required to ask for an accommodation that, given the nature of her complaint, was perfectly obvious. That is, she informed the Company that Rose was responsible for her stress and anxiety, and thus the Company should have known that separating her from her harasser was a simple and reasonable accommodation. The Company insists that an "employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it." (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 954.) Here neither plaintiff nor her doctor ever informed the Company that separating her from Rose would allow her to return to work. We need not determine whether an express request for separation under these circumstances was necessary given plaintiff's admissions that she was not able to return to work because she remained unable to perform her job.

Plaintiff relies on her declaration that her doctor released her to work based on his September 2010 evaluation. This declaration, however, was filed long after her deposition testimony and is the only evidence that she had been cleared to work if she was separated from Rose. She cannot defeat a summary judgment by contradicting her sworn deposition testimony. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22.) The declaration contradicts her admission that she did not begin to feel better until October or November 2010. And it is undisputed that plaintiff never told the Company she was ready to return to work, despite an open invitation to do so. In short, plaintiff's admissions that she was unable to perform her job with or without a reasonable accommodation support the trial court's ruling granting summary adjudication of the disability discrimination cause of action. (*Lawler v. Montblanc North America* (9th Cir. 2013) 704 F.3d 1235, 1242-1243.)

## IV

### *There Are Triable Issues of Fact Involving Other FEHA Causes of Action*

At its essence, plaintiff alleges that she became severely depressed and suffered anxiety attacks as a result of Rose's violent behavior and sexual harassment. In other words, her ensuing mental health condition rendered her disabled within the meaning of the FEHA. In three separate causes of action, she alleges the Company engaged in different employment practices outlawed by the FEHA: the failure to engage in a good faith interactive process to find a reasonable accommodation for a known condition or disability (Gov. Code, § 12940, subd. (n)), the failure to provide a reasonable accommodation (Gov. Code, § 12940, subd. (m)), and retaliation (Gov. Code, § 12940, subd. (h)). Her first cause of action, for wrongful termination in violation of public policy, rests on the viability of her FEHA claims. As the party moving for summary judgment, the Company bears the initial burden to demonstrate there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading or to establish a complete defense. (*Eriksson v. Nunnink* (2011) 191 Cal.App.4th 826, 848.)

**Failure to Engage in a Good Faith Interactive Process**

The FEHA not only forbids discrimination based on disability, it also imposes affirmative obligations on employers to ensure that they do not discriminate. Thus, an employer must take reasonable steps to accommodate employees with disabilities. In determining an appropriate reasonable accommodation, the employer is required to consult with the employee. The FEHA makes it "an unlawful employment practice . . . [¶] . . . [¶] [f]or an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." (Gov. Code, § 12940, subd. (n).) The interactive process burdens both the employer and the employee. Both have the continuous obligation to

18

keep communication open and not to obstruct the process. (*Scotch*, *supra*, 173 Cal.App.4th at pp. 1013-1014.) "Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith." (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 62, fn. 22.)

The trial court's ultimate obligation is to determine the cause of any breakdown in the interactive process and then assign responsibility so that liability ensues only where the employer bears responsibility. (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 985 (*Nadaf-Rahrov*).) The employer cannot prevail on summary judgment if there is a genuine dispute whether the employer engaged in good faith in the interactive process. (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 261 (*Jensen*).) "Although the interactive process is an informal process designed to identify a reasonable accommodation that will enable the employee to perform his or her job effectively [citation], an employer's failure to properly engage in the process is separate from the failure to reasonably accommodate an employee's disability and gives rise to an independent cause of action [citation]." (*Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 971 (*Swanson*).)

The Company asserts that there are no genuine issues of material fact because plaintiff failed to submit the questionnaire completed by her doctor, failed to request a reasonable accommodation, and failed to openly communicate with the responsible human relations personnel. A close examination of the materials submitted in opposition to the summary judgment motion presents a much murkier and nuanced story. Neither side appears blameless; indeed, both have admitted their shortcomings. The question is, of course, whether there remain factual disputes over how the interactive process broke down. Context and timing prove to be enlightening.

19

The context, from plaintiff's point of view, includes the two-year period of harassment that preceded her forced medical leave. She alleges she was subjected to verbal abuse, violent outbursts, and sexually inappropriate language culminating in the April 16, 2010, meeting during which Rose shouted profanities at her. Feeling humiliated and physically threatened, plaintiff suffered a panic attack requiring medical intervention. On April 19 her doctor put her on a two-and-a-half-week medical leave. A week later she filed an incident report in which she attributed her leave to work-related stress due to Rose's sexual harassment.

As the Company recounts, Sierra informed plaintiff that, in addition to filing a workers' compensation claim, she was entitled to a 12-week leave of absence under the FMLA. During this time period, plaintiff filed all the necessary paperwork to obtain workers' compensation, scheduled appointments with the workers' compensation doctors, and continued treatment with her private physician. She wrote to Sierra that she had not been told she needed to apply for family leave and objected to Sierra's designation of her medical leave of absence that began April 19 as family leave. She did not apply for family leave until July 12, 2010. Her physician, Dr. Lin, extended her medical leave several times.

But neither side focused on plaintiff's disability or the need to fashion a reasonable accommodation until she exhausted her family leave in July 2010. By then her sexual harassment complaint had been dismissed by the Company. According to plaintiff, in April, Sierra had assured her the Company was conducting a thorough investigation of her charges. Tappan, who alone conducted the limited investigation, interviewed only 2 of the 12 witnesses plaintiff identified on her incident report. He did not discuss the allegations with plaintiff. And before he issued a report, Sierra wrote to plaintiff, informed her that the investigation was complete, her charges were not substantiated, and she was expected to return to work with Rose. She further admonished her to find a way to work with the man she perceived to be her harasser, and she

20

threatened plaintiff with disciplinary action if she spoke about what she deemed to be a confidential sexual harassment complaint. Tappan and Sierra would both later admit that all of the witnesses should have been interviewed and that the rejection of plaintiff's charges was reached prematurely. Nevertheless, on July 7, 2010, plaintiff was definitively told her sexual harassment complaint was without merit and she was expected to work with Joe Rose.

Sierra accused plaintiff of failing to return calls and e-mails. In an e-mail on July 13, plaintiff rebutted those accusations in a detailed description of all the correspondence between them. Yet that damning accusation persisted. The management personnel who ultimately decided to fire plaintiff all testified they relied on Sierra's representation that plaintiff had failed to communicate with her.

To recap, when Sierra initiated the FEHA-required interactive process on July 16, 2010, the Company already had rejected plaintiff's sexual harassment complaint and had instructed her to continue to work with Rose. Forty-one days later, the Company fired her. Given this context and the abbreviated timeline, are there genuine issues of fact whether the Company engaged in a good faith interactive process during those 41 days?

The law is clear that both the employer and the employee share the responsibility to engage in open and ongoing conversations as they seek to find a reasonable accommodation for the employee's disability. (*Swanson*, *supra*, 232 Cal.App.4th at pp. 971-972.) The facts are not so clear. It is true that plaintiff had not returned the questionnaire Sierra had requested by August 26, when she was fired. It is also true that she had not explicitly told Sierra she could return to work if she was separated from Joe Rose. And finally, it is true that her leave had been extended multiple times, she had been off work for four months, and she had not given the Company a date certain when she could return.

But there are many inferences a jury might draw from the Company's handling of her grievance and its participation in the interactive process. A jury might excuse

21

plaintiff's failure to expressly ask to be separated from Rose since the Company had rejected her claims and ordered her to work with him. Not only is separation of a victim from her harasser an obvious accommodation requiring no clairvoyance on the part of the employer, but a jury might find that the Company, which failed to conduct a thorough investigation of an employee's allegations and ordered plaintiff to continue to work for the very man who had allegedly harassed her for two years, did not exhibit the requisite good faith essential to the interactive process. That is not to conclude that the Company acted in bad faith, only that plaintiff has raised a reasonable inference that the Company neither initiated nor continued to engage with plaintiff in the interactive process in good faith.

Moreover, plaintiff raises a number of other inferences a trier of fact might draw from the evidence she presents. She notes that the letter dated July 16 was not postmarked until 3 days later, a fact of some significance when she was given only 15 days to return the questionnaire. She also points out that she was unable to schedule an appointment with her doctor within the allotted time frame and notified Sierra that she could not be seen until August 23. Sierra agreed to extend the deadline until August 11, a date that provided no assistance to plaintiff since she could not see her doctor until August 23. It was not until plaintiff informed her a second time that she could not meet the August 11 deadline that Sierra agreed to extend the deadline to 5:00 p.m. on August 23.

A jury might reasonably infer that Sierra's rigidity evidenced bad faith. Her superiors testified that there was no reason they knew of for the self-imposed August 23 deadline. And, without any further inquiry or communication, plaintiff was fired three days later. Why was it necessary to receive the questionnaire by the end of the very day plaintiff had been scheduled to be seen? A trier of fact might conclude that the Company was anxious for plaintiff to fail; that is, the failure to turn in the questionnaire provided the justification for getting rid of an employee whose disability had become inconvenient

22

and irksome. We emphasize that the Company has a sound countervailing argument to make to the jury that it provided plaintiff with multiple extensions of time to return the questionnaire as a first step in ascertaining the scope of her disability and the possible accommodations it might provide and that, in the absence of the questionnaire, the entire process was stymied. Yet we must conclude that there remain layers of possible inferences to draw from the evidence, and although we must leave factual determinations to the jury to decide, those inferences are hotly disputed, genuine issues of fact.

The Company, however, expands the time horizon, insisting that plaintiff was to blame for a persistent failure to communicate from the time she went out on leave mid-April 2010 until she was fired four months later. The Company reminds us that it was not obligated to hold her job open indefinitely, particularly in light of her refusal to cooperate. These are arguments the Company certainly can make to the jury at trial, but they do not meet the Company's initial burden to demonstrate that plaintiff alone was the cause of the breakdown as a matter of law. There are a number of genuine, triable issues of material fact as to who was responsible for the breakdown. Thus, we must reverse the summary adjudication of the seventh cause of action for failure to engage in the interactive process.

**Failure to Provide a Reasonable Accommodation**

Under the FEHA, an employer's "fail[ure] to make reasonable accommodation for the known physical or mental disability of an applicant or employee" is an unlawful employment practice. (Gov. Code, § 12940, subd. (m).) "The elements of a failure to accommodate claim are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability." (*Scotch*, *supra*, 173 Cal.App.4th at pp. 1009-1010.)

Reasonable accommodation means "a modification or adjustment to the workplace that enables an employee to perform the essential functions of the position held or

desired." (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 983.)  Because an employer has a continuing affirmative duty to reasonably accommodate a disabled employee, a single failure to accommodate may give rise to liability despite other attempts to do so. (*Smith v. International Brotherhood of Electrical Workers* (2003) 109 Cal.App.4th 1637, 1653.)  "[T]he employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." (*Jensen*, *supra*, 85 Cal.App.4th at p. 263.)

An employer's duty to provide a reasonable accommodation is separate from its duty to engage in an interactive process and gives rise to an independent cause of action. (*Swanson*, *supra*, 232 Cal.App.4th at p. 971.)  And although the elements of a failure to accommodate are similar to the element of disability discrimination, there are important distinctions.  "The plaintiff must, in both cases, establish that he or she suffers from a disability covered by FEHA and that he or she is a qualified individual.  For purposes of a [Government Code] section 12940, subdivision (k) claim, the plaintiff proves he or she is a qualified individual by establishing that he or she can perform the essential functions of the position to which reassignment is sought, rather than the essential functions of the existing position." (*Jensen*, *supra*, 85 Cal.App.4th at p. 256.)  The employee need not prove that the failure to accommodate was caused by the employee's disability because the failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself. (*Ibid.*)

First, we must scrutinize plaintiff's deposition testimony to determine whether she made admissions that were fatal to her reasonable accommodation claim.  The Company

24

argues that her admission she was unable to return to work at all constitutes an admission that she was not qualified to perform the essential functions of the job. In other words, there remained no triable issue of fact for the jury to decide. We disagree. The Company relies on isolated excerpts from her testimony that distort their meaning or, at a minimum, eliminate all ambiguity. When her testimony is read in context, we conclude there remain triable issues of material fact.

Plaintiff appears to have been overwhelmed by the paperwork required by the Company as well as processing her workers' compensation claim and obtaining the medical services she needed to treat her ongoing anxiety and depression. She provided her doctor the questionnaire the Company required and she relied on him to meet the August 23 deadline the Company imposed. She was unsure whether he actually sent in the documentation by that date. She was discharged a mere three days later.

In the next-to-last paragraph of the written letter of termination, the Company invited plaintiff, "[i]f and when you are released to return to work, please let us know. At that time, we will evaluate what openings are available and reinstate your employment, if possible." When asked at her deposition whether she ever notified the Company she was prepared to return to work, plaintiff responded, "[W]orkman's comp sent them a letter saying that I could return as long as Mr. Rose did not -- as long as I didn't work under Mr. Rose." She further testified that the reason she did not personally notify the Company she could return to work was because she was on disability and she knew Mr. Rose was still there. After all, the Company previously had sent her a letter informing her she was required to work with Rose.

When asked what reasonable accommodation is, plaintiff testified: "In my circumstance, the only reasonable accommodation that I would be aware of would be if Mr. Rose was -- if I was not working with Mr. Rose. And they were very clear, Spare Time, that said for me to hush, come back to work and work under Mr. Rose." She testified she did not recall telling a Dr. Harbison that she could not return to work at

Natomas Racquet Club even without Joe Rose. She did concede that if she had seen another opening for a marketing director at another club before she was terminated she probably would not have applied for it because *at that time* she was very depressed and was under medical supervision. She stated she was "still pretty emotional and stressed and having a lot of anxiety." Indeed, she had told the Company from the outset that "Joe Rose's consistent verbal aggression, intimidation, severe abusive and offensive action causes a sense of dread and fear."

Plaintiff insisted that the Company's justification for terminating her because, among other things, she did not participate in the interactive process was a lie. She explained the basis of her belief as follows: "Interactive process is from beginning to end. I didn't -- one paper they were frustrated with. I sent them back forth, back forth. That to me -- to be terminated on one thing, when I tried and I told them over and over, to me it looks like an interactive process is just that one thing.

"And interactive process is the whole thing. How is my behavior throughout the whole process? Was excellent. Everything I did, everything workman's comp told me to do, everything they told me to do, I did.

"And so that is false. It's not right. And regarding the disability or being off, I never had any paperwork that said, I was going to be forever disabled."

Plaintiff does not believe she had a fair opportunity to request an accommodation that would have allowed her to return to work. She repeated the same allegation that the Company had rejected her request to work for someone besides Joe Rose. "I was working with -- I was told prior to this, that I was to come back and to do -- keep my mouth quiet and work with Joe Rose, and that was prior.

"So by the time this came, which was only probably a few weeks later, I did the best I could. I was seeing workman's comp to find out what was exactly, I need to do with my life because I was on disability. So at that point, I wasn't thinking about going to work. I was on disability." She stressed again, "*At this point right here,* I was on

stress leave disability." As of the date she was terminated, she "was very stressed and overwhelmed, and I don't think I was ready to go back to work." This was late August 2010.

Plaintiff began to feel ready to go back to work soon thereafter, although it was a painful and bumpy process. She explained, "I started feeling better, I mean, probably after I saw the QME doctor in late September, October, I mean I could -- I was on medication, and I was doing better. So I don't know October, November. There was up and down time."

When asked why she had not requested yet another leave of absence, she again had relied on the worker's compensation system. She testified, "Workman's comp was doing all that to find out. I got terminated on -- in August. A week or so later, workman's comp had all of that. So no, I wouldn't. I was figuring that's what that was all about. I did lots of paperwork, so they would have those answers."

Finally, plaintiff stated she would return to work because she did not have a choice. Financially, she could not afford not to work, whatever her mental state. She lamented, "I ran out of disability money, and I had no choice but to go on unemployment. Otherwise, I don't know if mentally, emotionally, I am actually ready. But I have to do what I have to do because I have -- I need to make money." In this vein, she is applying for any kind of employment. Having been off work for over two years, however, she expressed her insecurity and ambivalence about her ability to work for the Company. On the one hand she testified, "I could do any job in that company." On the other hand, however, she expressed her reservations and fears. "I want to say that I would [be able to do the job] -- I want to believe that I could do it. I mean I have a hard time during the day. I'm sad. I just -- I would do the best. I don't know. I mean -- I wouldn't know. I haven't been working for two years. I want to say I could do it."

She also expressed her resolve. "If I was presented the opportunity, I would do my best. I would go in there, and I would try to be the Kelly that I was. And I would try. And if it didn't work, it doesn't work, but I would try."

To say, therefore, that plaintiff unambiguously testified that she could not return to work whether Rose was there or not is to unfairly sanitize the record. From plaintiff's point of view, she had notified the Company that Rose had harassed her and created a hostile work environment with his violent outbursts, and despite her allegations, the Company had conducted a cursory investigation and ordered her to return to work for her abuser. Through the worker's compensation proceedings, the Company was also informed that plaintiff could return to work if she was separated from Rose. Thus, a jury could conclude that separation from Rose was the reasonable accommodation plaintiff sought.

Plaintiff's mental health, however, plummeted as a result of Rose's inappropriate behavior. Suffering from anxiety and depression, plaintiff did admit that she was not ready to return to work at that time. We believe that a jury could find her testimony was not a fatal admission that she was no longer permanently qualified to perform her job, but a recognition that while she was on disability she was temporarily too anxious and depressed to resume her responsibilities. Throughout her testimony, she conflated the worker's compensation proceedings with the interactive process she was engaged in with the Company. Her termination had come as a shock, she believed she had a temporary financial reprieve while she received disability benefits, and she was prepared to return to work as soon as her mental health allowed.

The jury, of course, may reject plaintiff's explanations and find she no longer remained qualified to perform the position, and therefore her accommodation claim may ultimately fail. But we conclude her testimony raises triable issues of material fact and entitles her to a jury assessment of the conflicting evidence.

28

The Company correctly points out that an indefinite leave of absence does not constitute a reasonable accommodation. In the Company's view, it had been flexible and generous in providing four months of leave, and in the absence of the questionnaire outlining the restrictions and limitations plaintiff required, it had no duty to hold the marketing position open indefinitely. The Company misunderstands plaintiff's argument and its initial burden in moving for summary judgment.

Plaintiff did not ask for an indefinite leave, nor does she argue on appeal that an indefinite leave would provide the accommodation she needs. Rather, her position throughout the litigation has been that she cannot return to work for the man who bullied and sexually harassed her for two years and who was responsible, to some degree, for her disability. The Company responds that neither plaintiff nor her doctor requested separation from Rose as a reasonable accommodation and it was her burden to do so.

But the Company forgets that as the moving party for summary judgment it bears the initial burden of proof and cannot prevail, as we explained above, unless it establishes through undisputed facts that it offered a reasonable accommodation; there was no position available at any of the Company's clubs for which plaintiff was qualified with an accommodation; or that it did everything it could to reasonably accommodate plaintiff but she failed to engage in discussions in good faith, and as a result, the informal interactive process broke down. (*Jensen*, *supra*, 85 Cal.App.4th at p. 263.) Having reviewed the evidence presented to us in support of and in opposition to the motion for summary judgment, we conclude there is an abundance of factual disputes whether the Company did, or should have, offered plaintiff a marketing position where she was not required to report to her alleged harasser; whether there was a suitable vacant position for her within the Company; or whether she was responsible for the breakdown in the informal interactive process.

At the heart of this case is the troublesome tension between the Company's duty to offer plaintiff a reasonable accommodation to work separate and apart from Rose, and

29

plaintiff's duty to specifically request such a separation and identify the job she could perform with such an accommodation. Since the interactive process broke down in a little more than one month it is impossible to determine what job plaintiff might have performed for the Company in the absence of her alleged tormenter. But it is the jury's prerogative, not ours, to resolve each of the factual disputes that remain. That is, a trier of fact must decide whether there was a suitable position available to her at the time the interactive process broke down and who was responsible for the breakdown. On these conflicting and equivocal facts, and the inferences a jury might reasonably draw from them, it cannot be said that the Company met its burden of establishing the absence of a triable issue of fact with respect to reasonable accommodation or that plaintiff was responsible for the breakdown in the informal, interactive process.

We believe there is no incongruity in reversing the trial court's summary adjudication of the failure to reasonably accommodate plaintiff's disability and in affirming the summary judgment as to her disability discrimination claim. As pointed out above, the two unlawful practices under the FEHA give rise to distinct causes of action and there are important differences between the two. Those differences are pertinent here.

To establish her claim that she was discriminated against because of her disability, plaintiff must present evidence that she was qualified for the job. Her admissions that she did not know whether she was able to return to work mean that she cannot meet her burden to prove she is a qualified individual for the position she left. In other words, using the appropriate jargon for resolving a summary judgment, the Company did satisfy its initial burden that her admissions precluded recovery for disability discrimination as a matter of law. But to prevail on her failure to offer a reasonable accommodation cause of action, plaintiff need only establish that she could perform the essential functions of the position she sought rather than the essential functions of the position she already had. She seeks to be separated from Rose. Because the interactive process was aborted so

30

quickly, the parties never explored the wide range of options that might have been possible. The Company asserts there were no marketing director vacancies at the other clubs. But that is not to say there were no other jobs for which she was qualified or that Rose himself could not have been transferred to another club or position within the company. Thus, although she admitted she was not able to return as the marketing director at the Natomas facility where she had been ordered to work for Rose, and therefore she was not qualified for that position, those admissions do not preclude her from establishing that she was qualified to perform the essential functions of any number of jobs as long as she did not have to work for Rose.

**Retaliation**

Retaliation for seeking a reasonable accommodation constitutes yet another unlawful employment practice under the FEHA. (Gov. Code, § 12940, subd. (h).) Plaintiff relies on indirect evidence of retaliatory intent to establish her retaliation claim against the Company. To establish her prima facie case under the FEHA, she must show she engaged in a protected activity, the Company subjected her to an adverse employment action, and a causal link existed between the protected activity and the adverse employment action. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) It is only the causal connection between her complaint of sexual harassment and her termination that is at issue.

The Company argues vehemently that there is no evidence of retaliatory animus contained in Sierra's letter of July 7, 2010, in which Sierra informed plaintiff that the investigation found no merit to her sexual harassment claim, she was expected to return to work for Rose, and she was prohibited from discussing her allegations. Nor was there any evidence, according to the Company, that either Russo or Anderson, who testified they saw no reason for the abbreviated deadline for returning the questionnaire, was involved in the decision to terminate her. The Company insists that plaintiff ignores her own responsibility to return the questionnaire to facilitate the interactive process and the

31

fact it had already provided her with two extensions of time to do so. The Company asserts that the decision to terminate her was based on legitimate business reasons, most prominently that sales had plummeted in the absence of a marketing director for four months, and plaintiff remained uncooperative and uncommunicative. Unsure when she was going to return, if ever, and unable to obtain the questionnaire or otherwise determine what her limitations and restrictions were, the Company was left with no choice but to fire her.

Plaintiff contends the Company has not established the lack of retaliatory animus as a matter of law. To the contrary, she asserts that the temporal proximity between making the accusations and her termination is sufficient evidence to show a causal link. "Close proximity in time of an adverse action to an employee's resistance or opposition to unlawful conduct is often strong evidence of a retaliatory motive." (*Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216, 1235, overruled on other grounds in *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1162-1163.) But she does not rely on temporal proximity alone. She argues that the July 7 letter threatening her with discipline if she discussed the investigation of her sexual harassment claim is yet another fact from which the jury could find a retaliatory animus. When coupled with a woefully inadequate investigation and Sierra's repeated lies that plaintiff had refused to communicate with them, plaintiff insists there are triable issues of fact and urges us to reverse the trial court's final ruling to the contrary.

We find that plaintiff's evidence establishes a prima facie case of retaliation and thereby shifts the burden to the Company to show a legitimate, nonretaliatory reason for the termination. (*Scotch*, *supra*, 173 Cal.App.4th at p. 1020.) For the reasons we have explained, the Company met this burden. The burden therefore shifts back to plaintiff to prove intentional retaliation.

Plaintiff need not present direct evidence of retaliatory animus but can rely on circumstantial evidence to raise a reasonable inference the employer intended to retaliate

against the employee. (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1219-1220.) We must liberally construe the evidence in favor of the opposing party. *(Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039 (*Hughes*).) Subservient to the rules of summary judgment review, including the stacked deck in favor of a party seeking resolution by a trier of fact, we conclude plaintiff has presented sufficient circumstantial evidence to raise a reasonable inference and thus a triable issue of fact that the decision makers were motivated by retaliatory animus. That evidence includes the perfunctory investigation of her complaint, the notice to her that the complaint was without merit before the report was prepared, the threat to her not to discuss the investigation, the imposition of an artificial deadline for submitting the questionnaire, and, most importantly, the insistence that plaintiff refused to communicate or to respond to calls, letters, and e-mails when she produced substantial evidence to the contrary. We acknowledge the evidence is far from compelling and a jury may well reject the inferences plaintiff urges us to draw. We conclude only that the evidence is sufficient enough to create a triable issue and therefore satisfy plaintiff's burden in opposing the summary judgment.

**Wrongful Termination in Violation of Public Policy**

" 'The tort cause of action for wrongful termination in violation of public policy provides a vehicle for recourse that otherwise would be unavailable under general rules of the at-will employment doctrine.' [Citation.] '[T]his public policy exception allows an employee to bring a tort cause of action against an employer who terminates an at-will employment on a ground that violates fundamental public policy.' [Citation.] 'FEHA's provisions prohibiting discrimination may provide the policy basis for a claim for wrongful discharge in violation of public policy.' [Citation.]" (*Diaz v. Federal Express Corp.* (C.D.Cal. 2005) 373 F.Supp.2d 1034, 1065.)

Plaintiff's ability to recover for the wrongful termination tort rests on the viability of her FEHA claims for failure to engage in an interactive process, failure to provide a

33

reasonable accommodation, and for retaliation.  Since we have found material issues of fact with respect to each of these alleged FEHA unlawful employment practices, we must reverse the summary adjudication of the wrongful termination against public policy cause of action as well.

V

### *Plaintiff Cannot Prevail on the Assault or the Intentional Infliction of Emotional Distress Causes of Action*

**Assault**

Plaintiff asserts that Rose's history of violent outbursts, including throwing objects, shouting obscenities, and manhandling a patron, creates triable issues of material fact to support her cause of action for assault.  "The essential elements of a cause of action for assault are:  (1) defendant acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in causing plaintiff's harm." (*So v. Shin* (2013) 212 Cal.App.4th 652, 668-669.)  Defendants contend plaintiff's assault claim fails as a matter of law because 1) she cannot establish that Rose intended to cause harmful or offensive contact and 2) " '[m]ere words, however threatening, will not amount to an assault.' [Citation.]" (*Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1604 (*Plotnik*).)

" ' "Generally speaking, an assault is a demonstration of an unlawful intent by one person to inflict immediate injury on the person of another then present." [Citation.]' (*Lowry v. Standard Oil Co.* (1944) 63 Cal.App.2d 1, 6-7.)  . . . 'A civil action for assault is based upon an invasion of the right of a person to live without being put in fear of personal harm.  Every person has "the right of protection from bodily restraint or harm." [Citation.]  . . .' (*Id.* at p. 7 . . . .) [¶] . . . [¶] . . . [A]ssault 'requires an intentional act and

34

actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another.' (*People v. Williams* (2001) 26 Cal.4th 779, 790; see *People v. Chance* (2008) 44 Cal.4th 1164, 1169 [assault ' "established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery" '].)" (*Plotnik*, *supra*, 208 Cal.App.4th at pp. 1603-1604.)

The facts of *Plotnik* provide an instructive template. In *Plotnik*, the alleged assailants, the Meihaus brothers, aggressively approached the victim, shortly after their father allegedly beat the victim's dog with a bat, and threatened to beat and kill both the victim and his dog. But because neither brother displayed a weapon, took a swing at him, or otherwise attempted to touch him, the court found that neither committed an act that could or was intended to inflict immediate injury on the victim. As a result, the court reversed a jury verdict for the plaintiff. (*Plotnik*, *supra*, 208 Cal.App.4th at p. 1604.)

Like that of the Meihaus brothers, Rose's alleged behavior, including his directive to plaintiff to "shut the fuck up," was threatening and intimidating. And we do not doubt plaintiff's assertion that she was frightened, given the additional fact that Rose stood in close proximity to her. But, as in *Plotnik*, there are no facts that Rose took any action to evidence an intent to inflict immediate injury on her. Thus, the Company's evidence was sufficient to shift the burden to plaintiff to create a triable issue of material fact.

This she failed to do. She relies exclusively on Rose's past behavior, and while deplorable, his history of violent outbursts did not give rise to a reasonable inference that he was about to strike her. He had never assaulted her in the past. Rather, the examples she recites of his throwing reams of paper and breaking a chair were not directed at her and did not constitute assaults. Even the incident she recounted in which he was forceful with a young man at the club was far different from striking his marketing director in front of an entire team. We conclude, as the Company urges, that the summary adjudication of the assault cause of action was properly granted because Rose's

35

obscenities, though offensive and possibly threatening, did not give rise to a reasonable inference that he was about to publicly batter plaintiff. (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 892.)

**Intentional Infliction of Emotional Distress**

A prima facie case of intentional infliction of emotional distress requires: " ' " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' " (*Hughes*, *supra*, 46 Cal.4th at pp. 1050-1051.) Plaintiff has not raised a triable issue of fact on these elements.

Summary judgment is proper if a claim cannot " 'reasonably be regarded as so extreme and outrageous as to permit recovery.' [Citation.] 'Conduct, to be "outrageous," must be so extreme as to exceed all bounds of that usually tolerated in a civilized society.' [Citation.] 'Severe emotional distress means . . . emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it.' [Citation.]. 'Ordinarily mere insulting language, without more, does not constitute outrageous conduct.' [Citation.]" (*Schneider v. TRW, Inc.* (9th Cir. 1991) 938 F.2d 986, 992.)

Plaintiff rejects the notion that Rose was merely insulting. She emphasizes the number of times he threw objects, broke a chair, and became physically intimidating while shouting obscenities. She distinguishes, therefore, those sexual harassment cases wherein the defendant used sexually inappropriate language and verbally berated the victim from her case, in which Rose had a demonstrated pattern of explosive behavior.

Defining where deplorable, heartless, and insensitive remarks, coupled with disgusting behavior, deserve opprobrium and where they become the type of extreme and outrageous conduct a civilized society cannot tolerate is a difficult task, particularly in the

36

sexual harassment arena. (See *Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 67-68 & fn. 21.) We certainly do not condone the type of behavior plaintiff alleges. Nevertheless, plaintiff alleges only one incident in which Rose's profanity was directed at her, and that was when he told her to "shut the fuck up." She does not allege any other occasion when he threatened her physically or directed his profanities at her. He never threw objects at her or directly at anyone else.

A trier of fact therefore could not reasonably find in her favor on this evidence. Outrageous conduct must ordinarily be directed at the plaintiff. (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 905-906.) Here, most of Rose's venom was directed at others, not at plaintiff. While a manager certainly should refrain from humiliating and threatening an employee with the use of profanity, we cannot say his outburst qualifies as the type of extreme and outrageous conduct the tort was designed to curb. (*Haberman v. Cengage Learning, Inc.* (2009) 180 Cal.App.4th 365, 389.) The summary judgment was properly granted as to plaintiff's cause of action for the intentional infliction of emotional distress.

## DISPOSITION

The judgment is affirmed in part and reversed in part as explained herein. The parties shall bear their own costs on appeal.

                                            RAYE            , P. J.

We concur:


        BUTZ          , J.


        RENNER        , J.

37